The **HERTZ CORPORATION**, a corporation (successor by merger to J. Frank Connor, Inc., a corporation, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

**Civ. A. No. 1921.**

United States District Court
D. Delaware.

July 17, 1958.

S. Samuel Arsht (of Morris, Steel, Nichols & Arsht), Wilmington, Del., Edgar Bernhard and Donald J. Yellon (of D'Ancona, Pflaum, Wyatt & Riskind), Chicago, Ill., John C. Klett, Jr. (of Cravath, Swaine & Moore), New York City, for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Anthony R. DeSanto, Gerard J. O'Brien, of Department of Justice, Washington, D. C., Leonard G. Hagner, U. S. Atty., Wilmington, Del., for defendant.

LAYTON, District Judge.

This is an action for the refund of federal income taxes paid by J. Frank Connor, Inc., a New Jersey corporation, and the plaintiff's predecessor by merger, for its fiscal years ended March 31, 1954, 1955 and 1956. The aggregate amount claimed is $14,561.12, as follows:

| Year Ended March 31 | Income Tax |
|---|---|
| 1954 | $ 100.15 |
| 1955 | 4,044.54 |
| 1956 | 10,416.43 |
| | $ 14,561.12 |

This litigation arises under the Internal Revenue Code of 1954 (Section 7422, Title 26, United States Code) and under Title 28 United States Code, Sections 1340 and 1346(a) (1), as amended.

The plaintiff takes the position that it is entitled, under Section 167(b) (2) of the Internal Revenue Code of 1954, 26 U.S.C. § 167(b)(2), to depreciate the automobiles and trucks purchased new after December 31, 1953, and used in its vehicle renting and leasing business, under the declining-balance method, using a rate of 200% of the straight line rate, that is, with respect to automobiles, 50% annually by the declining-balance, over a four year useful life.

These are the facts.

Connor, organized as a New Jersey corporation on April 2, 1947, was merged into the plaintiff on July 5, 1956, by a duly consummated statutory merger under the Delaware General Corporation Law and the Revised Statutes of New Jersey. The plaintiff, a Delaware corporation, thus became entitled to file the claims for refund of federal income tax which are the subject matter of the case at bar.

At all times material to this case, Connor was engaged in the State of New Jersey in the business of renting and leasing automobiles and trucks without drivers. "Renting" is the term used in the industry to describe the hiring of vehicles by salesmen, executives, engineers and tourists on a relatively short-term basis at the stipulated rates per mile and per hour or per day. "Leasing" is the term used in the industry to describe the contract hiring of vehicles for a fixed period on a relatively long-term basis (for example, by the year or longer period).

During the three taxable years in question, Connor had a preventive maintenance program to keep its cars safely on the road and mechanically in good condition. At 1,000 miles, for example, examination was made of certain parts of the vehicle, such as steering, brakes and so on. At 2,000 miles or 3,000 miles, the vehicles were given another examination for other safety factors. And at 6,000 miles, there was another mechanical inspection and, in fact, a constant system of inspection was kept in force as long as Connor owned the vehicles.

Connor's cars were regularly serviced, as any other owner might service them, by greasing, oiling, keeping the tires in

good repair and the like. For example, cars were greased or lubricated regularly at the 1,000 or 1,500-mile point, mileage records being kept of each individual car.

The factors affecting Connor's decision to buy and sell automobiles were not always predictable. Moreover, sales and purchases of automobiles by Connor did not necessarily accompany each other. One factor which governed Connor's decision as to when to buy cars was the public demand for Connor's service. In this connection, the influence of recession or prosperity had a marked effect on Connor's business. In a recession or slowdown in production, the engineer, salesman or executive does not make as many calls, work forces are being reduced, and the sources of U-Drive-It business are affected. Connor depended a great deal on the out-of-town businessman who would come to Newark, rent a vehicle while there, make his calls and return to his place of business by other means, plane or train.

Business conditions in Connor's immediate vicinity had an effect on its business. For example, since it depended on local people to rent its trucks, a slowdown in Connor's vicinity would cause it to have a surplus of trucks which it would have to dispose of. In connection with these considerations, in determining when to acquire or dispose of cars, Connor was motivated among other things by whether it was operating a substantial part of its fleet.

What Connor's competitors did had a great influence on its decisions about purchases of automobiles. If competitors were renting certain types of automobiles and those types were what the public demanded, Connor would have to do the same and keep up with the demand. This was only one of the factors which had to be taken into consideration in deciding when and whether to buy and sell cars.

In addition, the advent of mechanical changes in cars was an unpredictable factor in influencing Connor's sales and purchases of automobiles. Thus, when automatic transmission was introduced, many people wanted to rent automobiles which embodied that innovation. However, it was also true that a great many drivers who had been operating the conventional shift for years were reluctant to drive cars with automatic transmission, being fearful that such transmission would not take them up a hill—that it was not quite powerful enough. Connor was thus forced to keep both types of vehicles on hand.

Strikes and lockouts also had an effect on Connor's decisions with respect to purchases and sales of automobiles. Work stoppages, when the conveyors carrying vehicles from the factory were on strike, might cause a delay of months in moving out old vehicles because Connor was forced to hold on to its old equipment until it could expand with new vehicles.

Whether the country was at war or at peace had a great influence on Connor's decisions as to whether to buy or to sell vehicles.

Unexpected climatic conditions also had effect on Connor's timing in buying and selling. For example, in a disaster in New England when the telephone lines were down, one of its accounts, a telephone company, called and reported that it had to send hundreds of people into the affected area to repair the lines. There was a great demand for cars and the cars used for this purpose were used for a long period of time. This situation warranted Connor's purchasing additional vehicles to supply its transient trade in the interim.

When the Newark Airport was opened in 1951, a new and unexpected influence on Connor's car purchasing and selling decisions developed. Connor never anticipated that the Airport would produce a great deal of vehicle renting business. In 1952, it had a bad experience in Newark when the Newark Airport was closed down after a few disasters there. There were no rentals at all. However, when the Newark Airport reopened, it obtained an excellent location within the Airport terminal and started expanding

its airport business from that point. Within a year there was an increase of approximately sixty cars in its fleet. This was an unusual increase, Connor never having anticipated that volume of business from such an inconvenient location.

One of the more isolated reasons why Connor sold cars during the period in question was its financial situation. At one time, Connor had to sell automobiles to meet a bank loan; at another, to pay off finance notes; and, at still another, to pay the rent. None of the facts enumerated above was predictable in advance.

Under the influence of all of these factors, the periods during which Connor held automobiles and trucks used in its renting and leasing business varied considerably, not only during the taxable years under review, but also throughout the history of the Connor business.

The average holding period (not to be confused with "useful life") of cars sold during the fiscal years ended March 31, 1954, March 31, 1955, and March 31, 1956, was 26.17 months; the average holding period of cars sold during the entire nine-year period was 29.36 months. In other years, cars were held for as long as 81 months; even within the three-year period in issue for as long as 67 months in 1954, and 51 months in 1956.

The average holding period of trucks sold during the three fiscal years in question was 38.89 months; the average holding period of trucks sold during the entire nine-year period was 48.26 months. Some trucks were held, however, for much longer periods—as long as 101 months in 1950 and 85 months in 1956. All averages were computed on a weighted basis—giving effect to the number of cars sold in each year.

Certified public accountants, partners, respectively, in the firms of Ernst & Ernst, Price Waterhouse & Co., and Arthur Andersen & Co., testified that "useful life" has consistently meant and still means not the life of an asset in the hands of the taxpayer—a life which automatically cuts off if the taxpayer sells the asset before the end of that asset's business life—but the economic life, the business life, of the asset in whatever hands; and that the useful life of automobiles used for business purposes is four years.

Among other matters testified to by Mr. Jacobs, President of Hertz, was the fact that the rent-a-car industry is still young and in a formative stage. The vehicle renting and leasing business has grown with great rapidity in the past ten years. During that period, the idea of renting and leasing has come to be accepted by the public as a means of having an automobile or a truck at its disposal without the need for ownership. In view of this growth and the newness of the industry, business policies are fluid of necessity and changes have to be made in very important policies over the years.

The factors enumerated with respect to The Hertz Corporation present the same problems to others in the industry, including Connor, as they present to The Hertz Corporation. One salient fact is that there is "quite a bit of competition" in the vehicle renting and leasing industry, and competition has substantially increased during the last few years.

So far as concerns The Hertz Corporation, which owns and operates a rent-a-car business in some 170 cities, and licenses operations in some 650 other cities, there are a number of considerations governing the purchase and sale of automobiles over some of which Hertz has no control. One important factor is economic conditions. The factor of newness is far from the sole factor in considering the length of time Hertz keeps an automobile, and, if economic conditions warranted, it would be disregarded.

A further factor influencing Hertz's decisions on vehicle acquisitions and dispositions is the starting up of new competitors and the urge to try to match competition, a result of which is that Hertz is sometimes forced to make ear-

lier replacement of cars than it would like to make.

In addition, whether cars are kept or sold, whether additional cars are purchased, and also the holding period of cars, all depend on the factor of war or peace. During World War II, Hertz could not obtain any new automobiles and consequently had to operate its old ones. Hertz's fleet was thus operated for some five or six years, and some cars were operated as long as seven. This involuntary additional use involved great expense in connection with the maintenance of Hertz's vehicles. Mechanical innovations, such as automatic transmission, power steering and power brakes, wo%ld encourage Hertz to make replacemc/nts of automobiles if it were economical to do so. Strikes and lockouts have a serious effect on Hertz's automobile acquisition policies—for example, a General Motors' strike of some duration some years ago.

The advent of the small car is something which is facing Hertz at the present time. If the small car should be further developed and the lower-priced car becomes more in demand, there would be the very serious problem of trying to dispose of the present fleet of high-cost cars without substantial loss in order to replace the fleet with smaller, lower-cost cars.

The management of Hertz does not know now when it will sell the cars that it has on hand. None of the considerations above set forth with respect to Hertz's buying and selling decisions is predictable. As a practical matter, it is uneconomic to use an automobile for business purposes for a longer period than four years.

Over the years, "useful life" has come to be regarded in the field of business and accounting to mean the business life of an asset regardless of whether it passed from one owner to another. Useful life was meant to be the total life for which the asset was useful for business purposes. Not only was this the general accounting understanding of the concept of useful life, but the uncontradicted testimony of expert certified public accountants was that prior to the promulgation by the Commissioner of Internal Revenue of his 1956 regulations on depreciation, their experience with representatives of the Internal Revenue Service was always that the depreciation rate was computed on the basis of the aggregate business life, regardless of changes in the ownership of the asset.

On its income tax returns for its taxable years ended March 31, 1954, March 31, 1955, and March 31, 1956, Connor claimed the following amounts (computed as indicated) as depreciation deductions on new automobiles and trucks acquired by Connor after December 31, 1953:

| Fiscal Year Ended March 31 | Depreciation Claimed on Said Automobiles | Method of Computing Said Automobile Depreciation | Depreciation Claimed On Said Trucks | Method of Computing Said Truck Depreciation |
|---|---|---|---|---|
| 1954 | $ 180.92 | Four-year life, using rates of 30% for each of the first two years and 20% for each of the last two years; however, automobiles acquired after December 31, 1953 but prior to April 1, 1954 were depreciated at the rate of two or three cents per mile. | $ 71.37 | Five-year life for vans and heavy-duty trucks; four-year life for other trucks; however, trucks acquired after December 31, 1953 but prior to April 1, 1954 were depreciated at the rate of three cents per mile. |
| 1955 | $14,737.34 | | $3,607.78 | |
| 1956 | $46,892.12 | | $5,721.99 | |

Connor duly paid all taxes shown on said returns. Its return for the taxable year ended March 31, 1955, was examined by the Internal Revenue Service office at Newark, New Jersey, and approved as filed except for a minor adjustment in administrative expense unrelated to the issues in the case at bar. That return showed and claimed depreciation deductions on the basis of a four-year useful life for automobiles, a five-year useful life for vans and heavy-duty trucks and a four-year useful life for other trucks.

The above statement of facts may be taken as the Findings of Fact. It consists in part of a stipulation as to certain facts, the testimony of witnesses and exhibits. Actually, the government put no witnesses on the stand nor did it cross-examine the plaintiff's witnesses to any extent. It may be said in fairness that the government does not challenge the facts upon which the plaintiff relies —rather, it contends that they in no way affect its legal position.

There are three questions presented.

I. Under Section 167(b)(2) of the Internal Revenue Code of 1954, is the "useful life" of an automobile the period of its usefulness for business purposes, or only the period it is held by the taxpayer?

II. Under the declining-balance method of depreciation, shall salvage value (other than such salvage value as is inherent in the declining-balance method) be imposed as a limitation upon the taking of depreciation under that method?

III. May Treasury Regulations 1.167 (a)–1(b) and 1.167(a)–1(c), 1954 Code, be applied retroactively?

These are not only interesting and novel questions [1] but also difficult of approach. Perhaps the best opening is to quote the Act upon which the disputed regulations were based. It reads:

"Internal Revenue Code of 1954:
"§ 167. Depreciation
"(a) *General rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income.

"(b) *Use of certain methods and rates.*—For taxable years ending after December 31, 1953, the term 'reasonable allowance' as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

"(1) the straight line method,

"(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1).

"(3) the sum of the years-digits method, and

"(4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2).

"Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a).

1. Except for Evans v. Commissioner of Internal Revenue, 16 CCH Tax Ct.Mem. 156 (July 31, 1957) where the Tax Court held for the Government in respect to the salvage value question without, however, assigning any reasons for its conclusions, this case is one of first instance.

"(c) *Limitations on use of certain methods and rates.*—Paragraphs (2), (3), and (4) of subsection (b) shall apply only in the case of property (other than intangible property) described in subsection (a) with a useful life of 3 years or more—

"(1) the construction, reconstruction, or erection of which is completed after December 31, 1953, and then only to that portion of the basis which is properly attributable to such construction, reconstruction, or erection after December 31, 1953, or

"(2) acquired after December 31, 1953, if the original use of such property commences with the taxpayer and commences after such date. * * *"

Thereafter, the Commissioner promulgated the three following regulations:

"Sec. 1.167(a)–1 *Depreciation in General.*—(a) *Reasonable allowance.*—Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(f) and section 1.167(f)–1. An asset shall not be depreciated below a reasonable salvage value under any method of computing depreciation. See paragraph (c) of this section for definition of salvage. The allowance shall not reflect amounts representing a mere reduction in market value.

"(b) *Useful Life.*—For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. * * *

"(c) *Salvage.*—Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life under the rules of paragraph (b) of this section, salvage value may be redetermined based upon facts known at the time of such redetermination of useful life. Salvage, when reduced by the cost of removal is referred to as net salvage. The time at which an asset is retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. However, if the taxpayer customarily uses an asset until its inherent useful life has been substantially exhausted, salvage value may represent no more than junk value. Salvage value must be taken into account in determining the depreciation deduction either by a reduction of the amount subject to depreciation or by a reduction in the

rate of depreciation, but in no event shall an asset (or an account) be depreciated below a reasonable salvage value. See, however, section 1.167 (b)–2(a) for the treatment of salvage under the declining balance method * * *."

It is about the definition of the terms "useful life" and "salvage value" contained in the above regulations that this controversy centers. Insofar as concerns the Revenue Laws, these two terms had their origin in the attempts by the Department of Internal Revenue and the Courts to set up a proper standard for the deduction of a reasonable allowance for depreciation. Thus, we find Mr. Justice Brandeis stating in United States v. Ludey, 1927, 274 U.S. 295, 47 S.Ct. 608, 610, 71 L.Ed. 1054:

"The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost."

But neither the Congress nor the Department gave an official definition of "useful life" and "salvage value."[2] Consequently, like Topsy, their meaning just "growed".[3] Based upon accepted accounting principles, "useful life" came to mean the period over which the particular piece of property was capable of performing the task for which it was created. In other words, it was the whole physical life of the asset, not just in the hands of a particular taxpayer, which determined its "useful life". And, over the years, "salvage value" became generally defined as scrap value, or the remainder left in the asset when it was worn out. Gradually, then, the practice grew for the taxpayer to deduct the scrap value from the cost or other basis of the asset before spreading the depreciation over its physical life. Moreover, owners of businesses having a fairly fast turnover of assets (such as car rental agencies) found that because of high demand for their used assets, they could be sold for prices greatly in excess of their junk or scrap value. And these taxpayers were quick to realize that under Sec. 1231 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1231, the substantial excess between the junk or scrap value of these assets and their sales price could be reported as capital gains rather than income. Thus, in the case of a corporation, the tax saving was the difference between 25% and 52%. The Department was well aware that substantial losses in revenue were occurring under Section 1231 which permitted capital gains treatment of profits realized upon the sale of depreciable property used in a trade or business. Yet its efforts to correct the situation were desultory. On the one hand, it was attempting to stamp out what it conceived to be the fast growing evil by trying to persuade Congress to enact more stringent legislation and in attempting to persuade the Courts that the sale of such used assets was income,[4] while, on the other hand, it seemed to be reconciled to the result.[5] Then came the Revenue Act of 1954, and the Department has seemingly found in its

---

2. Treasury Reg. 45 (1920 Ed.) Article 161 used the phrase "useful life in the business".

3. Throughout this brief discussion of the legal background of the terms "useful life" and "salvage value", I am indebted to the excellent article by L. Call Dickinson, Jr., in the Drake Law Review, Vol. 7, Dec. 1957, Number i, p. 32.

4. On both propositions, the Department was unsuccessful. Congress maintained a hands-off policy and the Courts refused to treat the sale of the used assets as income. Philber Equipment Corp. v. Commissioner, 3 Cir., 237 F.2d 129.

5. For instance, in this very case, Hertz, as soon as the merger of Connor was completed, sought and obtained permission to amend Connor's 1954, 1955 and 1956 returns by claiming the proceeds from the sales of its used cars over this period as capital gains. Presumably, then, Hertz had been making returns on this basis without opposition from the Department. Moreover, the returns were filed and approved by the Department's field representative.

language, albeit belatedly, the intent of Congress to prohibit the practice. Accordingly, in June 1956, (after first withdrawing regulations dealing with depreciation, etc., which were the same as those under the 1939 Act) the Department promulgated and issued the above quoted Regulations numbered 1.167(a)–1, dealing with depreciation in general, 1–167(b)–1, defining "useful life" and 1–167(c)–1, defining "salvage value". A number of taxpayers employing the declining-balance method were caught in the net of these new regulations. The average use by the plaintiff of the cars in its business during the three years in question was 26-plus months. Unable to meet literally the requirements of Sec. 167(c), the plaintiff is driven to the position that the meaning of the term "useful life" is the overall life of its automobiles (not just the period of use to which it puts its cars) and, since, by generally accepted accounting standards the average useful life of a car in business is four years, it contends that it is entitled to claim the benefits of the section. The Department joins issue raising the first question for disposition, namely, does useful life mean the life of the asset as long as it is used by the taxpayer or its whole life?

The Commissioner's argument is based in the main upon three grounds. First, he says that the tax laws for many years have permitted a "reasonable allowance" for depreciation, as a result of which the Department is vested with broad authority to promulgate regulations governing the taking of depreciation. Secondly, he contends that the term "useful life" is but one of the elements of depreciation and means, not the whole physical life of the asset, but its useful life in the taxpayer's business. Thus, it follows that this taxpayer, the useful life of whose cars is only 26 months, cannot take advantage of the declining-balance method of depreciation which limits the use of such method to taxpayers with assets whose useful lives exceed three years. Thirdly, he says that to construe the phrase "useful life" as the whole physical life of the asset would have the effect of distorting the long-settled concept of depreciation which, insofar as concerns the tax laws, has meant from its inception a reasonable allowance, or sum, which should be set aside annually in order that at the end of the useful life of the asset, the aggregate of the sums set aside will, together with salvage value, equal its original cost. Detroit Edison Co. v. Commissioner, 319 U.S. 98, 63 S. Ct. 902, 87 L.Ed. 1286. To construe "useful life" as the whole physical life of the asset, the Commissioner argues, permits taxpayers in businesses having a rapid turnover of assets to sell a comparatively new asset at a relatively high price and treat the difference between the sale price and junk salvage value as capital gains rather than income, resulting in a tax avoidance scheme of some magnitude.[6]

6. An example taken at random from Exhibit B illustrates this result:

Automobile No. 239—Chevrolet #010854—Held and used by taxpayer for 14 months and then sold:

| | | |
|---|---:|---:|
| Cost: | | $2,048.00 |
| Depreciation (50% of Declining Balance): | | |
|     1st year | $1,024.00 | |
|     2nd year (held 2 months) | 85.33 | 1,109.33 |
| Basis at time of sale (1/15/57) | | $ 938.67 |
| Selling price | | $1,600.00 |
| Long term capital gain | | 661.33 |
| Tax on gain (25%) | | 164.33 |
| Net gain after taxes | | 496.00 |
| Recovery through depreciation | | 1,109.33 |
| Recovery of remaining basis through sale | | 938.67 |
| Total recovery | | $2,544.00 |

This argument is not unimpressive. It is axiomatic that regulations of a Department of Government have the force of law if "adapted to the enforcement of an Act of Congress the administration of which is confided to such department" and if it does not conflict with the intent of the Act under which the regulation is drawn. The St. Louis Co. v. United States, D.C.Del.1955, 134 F.Supp. 411. Thus, if Sec. 1.167(c)–1 of the Regulations defining "useful life" as the useful life of the asset in the taxpayer's business reflects the intent of Congress in Sec. 167(c) of the Internal Revenue Code of 1954, then the Regulation is valid.

Moreover, I would concede that, in its inception at least, the phrase "useful life" meant useful life in the business. Not only did the Treasury Regulation so define it (U.S.T.Reg. 45, Article 161 [1919]), but we find Mr. Justice Brandeis using the phrase "useful life of the plant [asset] in the business" in his now classical definition of "reasonable allowance" in United States v. Ludey elsewhere quoted.

Finally, I must agree that to define "useful life" as the whole useful life of the asset not only lends an artificial connotation to the words but changes substantially the long-settled notion that Congress by providing for the taking of a "reasonable allowance" for depreciation intended to permit the taxpayer to recover the original cost of the asset and no more.

But the Commissioner's argument glosses over two important aspects of this case. First, regardless of their original meaning, by 1954 "useful life" meant the whole physical life of the asset. Secondly, if Congress in 1954 enacted Sec. 167(c) with that latter definition in mind, then it would follow that some departure from the settled concept of depreciation was intended, at least as regards the declining-balance method of depreciation. It is to this subject that our inquiry must be addressed.

I accept the testimony of accountants from nationally recognized firms that by 1954, the phrase "useful life" was taken in business and accounting circles to mean the whole physical life of the asset and that the useful life of an automobile used in a business was four years. Their testimony was virtually unchallenged on cross-examination and the Commissioner offered no testimony in his own behalf.

What interpretation did the Department through its actions and pronouncements place upon the term? A comparison between Treasury Regulation 45 (1920 Ed.) Article 161 and Treasury Regulation 111, Sec. 29.23(L) 1 (1942) shows that in 1942, the Department ceased referring to "useful life" as "useful life of the property in the business" and adopted the language "useful life of the depreciable property." And it is not without significance that this regulation was in force for two years following the passage of the 1954 Code until withdrawn in 1956 in favor of the regulations now under attack. For years, the Treasury Department's Bulletin F (Rev.Jan. 1942) defining the Department's general depreciation policy and tables of estimated lives of certain assets has used this language:

> "The Federal income tax in general is based upon net income of a specified period designated as the taxable year. The production of net income usually involves the use of capital assets which wear out, become exhausted, or are exhausted, or are consumed in such use. The wearing out, exhaustion, or consumption usually is gradual, extending over a period of years. *It is ordinarily called depreciation, and the period over which it extends is the normal useful life of the asset.*"
> (Emphasis added.)

This bulletin goes on to recommend to taxpayers that for depreciation purposes, they assign a three year life to business cars and a five year life to pleasure cars. In Rev.Rul. 108, 1953–1 C.B. 185, the Commissioner referred to the practice of selling automobiles after "leasing them for substantially less than their

normal useful lives." Compare also Rev. Rul. 54–229, 1954–1 C.B. 124, which uses substantially this same language. In this very case, Hertz was permitted to amend the 1954, 1955 and 1956 returns of Connor by changing to the declining-balance method and these returns were approved by the local office in Newark, N. J.

All of this fairly confirms the testimony of the accountants that the Commissioner, himself, in the great majority of cases was interpreting "useful life" as the whole useful life of the asset and accepting the useful life of an automobile used in a business as four years.

The attitude of the Courts with reference to the meaning of "useful life" prior to the passage by Congress of the 1954 Code is a proper subject for consideration here. In the following cases, the Board of Tax Appeals conceded a four year useful life to the business automobiles of the taxpayer despite its practice of disposing of them in less than three years. In re Sanford Cotton Mills v. Commissioner, 1929, 14 B.T.A. 1210; In re Merkle Broom Co., 1926, 3 B.T.A. 1084; Max Kurtz v. Commissioner, 1927, 8 B.T.A. 679.

In General Securities Co., B.T.A. Memo, CCH Dec. 12,500–D (1942), affirmed 6 Cir., 1943, 137 F.2d 201, the Board said this:

"In its business petitioner used one or two automobiles in which its agents traveled over territory located in all of the southern states. Each automobile traveled some 60,-000 to 75,000 miles a year. Petitioner kept his automobiles from one to two years. When petitioner traded its cars in after one year, from a value standpoint, they had a third to a half of their original value left. The normal useful life of automobiles used by petitioner in its business was three years." (B.T.A.

Memo., CCH Dec. 12,500–D, at 37,-941)

Pilot Freight Carriers, Inc., 15 TCM 1027 (1956) and Massey Motors, Inc., v. United States, D.C.S.D.Fla.1957, 156 F.Supp. 516 are recent decisions of lower Courts reaching the same result. In the brief of the Commissioner in Philber Equipment Corp. v. Commissioner, 3 Cir., 1956, 237 F.2d 129, this significant language is used by counsel for the Government:

"Because of existing conditions taxpayers knew when it purchased equipment that it would likely be able to rent such equipment only for a period that was *substantially less than its useful life.*" (Emphasis added.)

Other cases illustrate the same distinction betwen useful life of an asset in the business and its whole, physical life: West Virginia & Pennsylvania Coal & Coke Co., 1925, 1 B.T.A. 790; W.N. Foster, et al., 2 TCM 595 (1943); Nat Lewis, 13 TCM 1167 (1954). It is safe to say that prior to the passage of the 1954 Act, a fairly steady line of lower court decisions had emerged recognizing "useful life" as a word of art meaning the whole physical life of the asset. It is difficult, however, to attribute too much significance to these cases because of the peculiar facts involved and the failure of the Courts to attempt to rationalize the result into any general rule. It is obvious also that none of them deals with the declining-balance method of depreciation.

Three other matters are worth brief notice. In 1947 and 1948, during extensive Revenue Revision hearings held by Congress, the Treasury Department submitted a report to the Ways & Means Committee of the House warning against revenue losses through the benefits of capital gains treatment of profits from the sale of assets subject to accelerated depreciation [7] but Congress did not act.

---

7. "[A] danger is that accelerated depreciation allowances might be used to convert ordinary income into capital gains, since a businessman might sell a fully depreciated asset that still had a substantial value, paying a tax on the capital gain and avoiding the taxes on its income that were deferred during the period of

Nor again, during the debates on the 1954 Act when the Committee on Federal Taxation of the American Institute of Taxation recommended that gains on property used in the business be treated as income did the Congress act. And finally, when Congress limited the taking of capital gains in connection with rapid amortization of emergency facilities, it did not see fit to limit capital gains upon the sale of assets used in a trade or business. Compare Sec. 168 and 1238 of the 1954 Code with Sections 167 and 1231 of the same code.

However, even this lengthy survey into the background of "useful life" produces inconclusive results. Clearly, Congress has been most reluctant to furnish needed clarifying legislation and has shown a disposition to avoid legislation which would deny to the sellers of used assets the privilege of treating their gains as capital gains. True, a number of lower Courts, including the Board of Tax Appeals, have from time to time regarded "useful life" as useful life of an asset through its whole physical life. And, admittedly, the Commissioner both by affirmative actions and frequent pronouncements on the subject has seemingly acquiesced in this result. Under the circumstances, there is a temptation to apply the familiar rule of construction which gives to an ambiguous term its accepted meaning at the time of its employment in the statute, i. e., the meaning business and accounting circles, the Courts and the Commissioner had been attributing to it. Fieldcrest Dairies v. City of Chicago, 7 Cir., 122 F.2d 132.

It is my view, however, that a careful study of the reports of the Committees of both Houses bearing upon the 1954 Revenue Act reflects the Congressional meaning to be ascribed to "useful life" too clearly to justify resort to artificial rules of interpretation. Certain of the language of the reports of the committees of both Houses is here set out.

"The acceleration in the speed of the taxfree recovery of costs is of critical importance in the decision of management to incur risk. The faster tax writeoff would increase available working capital and materially aid growing business in the financing of their expansion. For all segments of the American economy, liberalized depreciation policies should assist modernization and expansion of industrial capacity, with resulting economic growth, increased production, and a higher standard of living." H.R. 8300 (House Report No. 1337, p. 24).

"Interpretation of the word 'reasonable' has given rise to considerable controversy between taxpayers and the Internal Revenue Service. The determination of useful life for a particular asset, or the average useful life for a group of similar assets, is a matter of judgment involving, in addition to physical wear and tear, technological and economic considerations. The method of allocating depreciation to years of use is also a matter of judgment. In many cases present allowances for depreciation are not in accord with economic reality, particularly when it is considered that adequate depreciation must take account of the factor of obsolescence.

\*  \*  \*  \*  \*  \*

"In the formation of its liberalized depreciation policy your committee relies heavily upon the use of an improved declining-balance method. This method concentrates deductions in the early years of service and results in a timing of allowances more in accord with the actual pattern of loss of economic usefulness. With the rate limited to twice the corresponding straight-line method and based on a realistic estimate of

accelerated depreciation. This type of avoidance could be overcome by requiring that if the taxpayer elects to use accelerated depreciation, gain to the ex-

tent of the excess of accelerated over normal depreciation must be treated as ordinary income."

useful life, the proposed system conforms to accounting principles." House Report No. 1337, pp. 22, 23, 24.

To the same effect is the Report of the Finance Committee of the Senate:

. "The liberalized declining-balance method included in the bill concentrates deductions in the early years of service and results in a timing of allowance more in accord with the actual pattern of loss of economic usefulness. With the rate limited to twice the corresponding straight-line rate and based on a realistic estimate of useful life, the proposed system conforms to sound accounting principles." Senate Report No. 1622, p. 25.

And the language appearing in Senate Report No. 1622, at page 29:

"(c) Restriction of declining-balance rate on short-lived assets.— The use of the 200 percent declining-balance rate in the case of short-lived properties would result in extremely fast writeoffs. For example, in the case of an asset with a 2-year service life, the doubling of the 50-percent straight-line rate would be equivalent to expensing the cost in the year of acquisition. These properties would retain substantial value and could be resold subject to capital gain rates.

"To prevent unrealistic deductions and resulting tax avoidance, your committee has provided that the liberalized methods be made available only with respect to assets with useful lives of 3 or more years."

A careful consideration of this language indicates to me an intention on the part of Congress to make sweeping changes in existing policy with reference to the taking of depreciation with

special emphasis on the declining-balance method. Thus we see that *the acceleration in the speed of the tax free recovery of costs is of critical importance* [8] in order that the Country may have a *resulting economic growth, increased production and a higher standard of living*. It is obviously felt that certain businesses which are forced to dispose of assets while still relatively new should be allowed to *concentrate deductions in the early years of service* thus bringing depreciation allowances *more in accord with the actual pattern of loss of economic usefulness*. However, I can ascertain no intention to increase the allowance for depreciation on a more realistic basis because, according to the Committee notes, *the changes made in your Committee's bill merely affect the timing and not the ultimate amount of depreciation deductions with respect to property*. House Report No. 1337, p. 25. Of first significance is the accent of Congress upon *a realistic estimate of useful life*. When read in connection with the following language the true meaning of Congress emerges: *the use of the 200 percent declining-balance rate in the case of short-lived properties would result in extremely fast writeoffs*. And then the Report goes on to demonstrate that in the case of an asset with a two year life (such as defendant's automobiles at 26 months), the application of the declining-balance method would result in · *expensing the cost in the year of acquisition*. So, Congress proposes to terminate the practice (of which it was well aware) of defining "useful life" as the whole physical life of the property. *To prevent unrealistic deductions and resulting tax avoidance,* the use of the declining-balance method was limited to assets having useful lives (real, not artificial) of three years or more.[9] Moreover, the long-settled concept that the reasonable annual allowance

8. Words italicized represent quotations out of the Committee reports.

9. Why, it is permitted to ask, would Congress so clearly limit the use of the declining-balance method to taxpayers having assets with useful lives of three years or more only to see its intention frustrated by the artificial construction of "useful life" relied upon by the plaintiff?

for depreciation together with salvage would equal original cost would in theory, if not in actual practice, remain undisturbed, i. e., *the proposed system conforms to sound accounting principles.*

And the Commissioner, to whom the administration of the tax laws is entrusted, has broad authority under Sec. 167(a) to adopt reasonable[10] regulations calculated to interpret and put into practice the new concept of taking depreciation. Maryland Casualty Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297.

In my judgment, it follows that Sec. 1.167(a)–1 of the Regulations here under attack, does not violate Sec. 167(c) of the Revenue Code of 1954, and the plaintiff, the useful life of whose cars is less than three years, may not use the declining-balance method of depreciation.

However, the Commissioner concedes that the average useful life of the plaintiff's trucks exceeds three years and that it may employ the declining-balance method in connection with the taking of depreciation thereon. The next question, then, is whether salvage value is a factor in computing depreciation under the declining-balance method.

My conclusion that "useful life" as used in 167(c) means useful life in the business necessarily negates the idea that salvage value could mean scrap value, for only if the asset were used over its whole physical life could it be reduced to scrap value. It remains to be decided then whether, in applying the declining-balance method, a reasonable salvage value based upon experience should be applied or whether salvage value is inherent in the method itself.

The Commissioner relies chiefly on the decision of the Tax Court in Robley H. Evans, elsewhere cited, where the Court held that a salvage value based upon the estimated proceeds of the disposition of the asset at the end of its useful life in the taxpayer's hand should be taken into consideration. The force of the decision is blunted because it gives no reasons for the result.

The taxpayer argues that a salvage value is inherent, or "built in", to the declining-balance method. This is so because a constant rate is applied annually to the remaining unrecovered cost of property. Using, for example, a property which cost $1000.00, and having a four year estimated life, the rate would be 50% the first year, or $500.00, and 50% of the balance each year with the result that at the end of the fourth year, the property would not be fully depreciated.[11]

Not only is this reasoning theoretically correct but other considerations are persuasive of this result. In the first place, the Commissioner has not for some time in the past considered a salvage value in the declining-balance method. Thus, on Form 2106, Rev.Oct. 1956,[12] there appears this explanatory note after item (41):

"Salvage value is the estimated resale or trade in value of the vehicle determined at the time of purchase. If *declining balance* method

---

10. "There shall be allowed as a depreciation deduction a *reasonable allowance* for * * *." Sec. 167(a). (My emphasis.)

"The determination of the useful life for a particular asset * * * is a *matter of judgment.*" House Report No. 1337, supra. (My emphasis.)

11. (1) $1000.
       x50%
    ―――――――
     $500.00

(2) $500.
    x50%
―――――――
  $250.

(3) $250.
    x50%
―――――――
  $125.

(4) $125.
    x50%
―――――――
  $62.50

12. A work sheet for use by a taxpayer claiming allowable expenses on automobiles used in business.

of depreciation is used, *disregard* salvage value in computing depreciation." (My emphasis.)

Of much greater significance, at page 201 of the Report of the Senate Finance Committee bearing upon the 1954 Internal Revenue Code, we find this language:

"The salvage value is not deducted from the basis prior to applying the rate, since under this method [the declining-balance method] at the expiration of useful life there *remains an undepreciated balance which represents salvage value.*" (My emphasis.)

On this latter point, both the Commissioner in the past and the Congress presently are in complete agreement and the intent of Congress being clear, I conclude that salvage value other than that which is inherent in the method is not a factor in determining depreciation under the declining-balance theory of depreciation.

The final question is whether or not, under the circumstances, the Commissioner may apply these regulations retroactively to include years prior to their promulgation. Retroactive laws are not favored. Long prior to the issuance of the new regulations in 1956, the Commissioner by his pronouncements and conduct had apparently acquiesced in the construction of "useful life" given to the phrase by business and accounting circles and had been permitting taxpayers to make use of the declining-balance method of depreciation in situations similar to this. Nor did the language of the regulations (prior to that now under consideration) give any indication that the hitherto long-settled interpretation of the term would be changed. Furthermore, when the words "useful life of the depreciable property" were inserted in the Regulations in 1942, they were capable of the construction that "useful life" meant the whole physical life of the property.

Taxpayers had a right to file their returns in reliance upon the Commissioner's long-continued interpretation of his own Regulations. Here a new regulation has been promulgated defining the term "useful life" pursuant to a statute which for the first time has employed the term and where the intention of Congress with respect to its definition is clearly contrary to the interpretation, as evidenced by conduct and frequent pronouncements, which the Commissioner had given it in the past. Common justice requires that it be given a prospective construction only. Compare Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536; Shearer v. Anderson, 2 Cir., 16 F.2d 995, 51 A.L.R. 534; A Summary of the Regulations Problem, 54 Harvard Law Review 398 (411). What has been said heretofore with reference to salvage value does away with the necessity of deciding whether Sec. 1.167(c) can be applied retroactively.

An Order will be entered in accordance with this opinion.