**UNITED STATES of America,**
**Appellant,**

v.

**S & A COMPANY, Appellee.**

**No. 17555.**

United States Court of Appeals
Eighth Circuit.

Nov. 27, 1964.

Van Oosterhout, Circuit Judge, dissented.

Harry Marselli, Tax Div., Dept. of Justice, Washington, D. C., made argument for appellant. Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, William A. Friedlander, Dept. of Justice, Washington, D. C., and Miles W. Lord, U. S. Atty., Minneapolis, Minn., and Leigh J. Gard, Asst. U. S. Atty., Minneapolis, Minn., were on the brief.

John S. Hibbs, Minneapolis, Minn., made argument and filed brief for appellee; John W. Windhorst and Dorsey, Owen Marquart, Windhorst & West, Minneapolis, Minn., were with him, on the brief.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

BLACKMUN, Circuit Judge.

This tax controversy centers on the unanticipated and non-customary good-faith sale, during the taxpayer's fiscal year 1956, of all operating assets used in its business of manufacturing and marketing outboard motors. The sale price was greater than the assets' adjusted basis at the beginning of the tax year and, indeed, was even greater than original cost. The question is whether, on these facts, the taxpayer is entitled to any deduction for depreciation on the sale assets in the sale year. Chief Judge Devitt found that the deduction claimed was a "reasonable allowance", within the meaning of § 167 (a) of the Internal Revenue Code of 1954, unless the sale "in and of itself creates a reason for changing the depreciation allowance". He concluded that it did not.[1]

---

1. It has been said, as to this holding, "The court's rejection of the Commissioner's position is supported by both authority and reason." 48 Minn.L.Rev. 628, 632–33 (1964).

218 F.Supp. 677 (D.Minn.1963). Judgment for the taxpayer in the amount of $72,590.76 was entered.

From a practical point of view, the issue is whether, on the one hand, depreciation in a favorable sale year may serve to offset ordinary income, with, as a result, greater capital gain on the sale, or, on the other hand, may not be so offset, with resulting greater ordinary income and less capital gain.[2]

Here, once again, see General Bancshares Corp. v. Commissioner, 326 F.2d 712, 713 (8 Cir. 1964), cert. denied, 85 S.Ct. 62, it may offhand seem surprising that this question arises only now, after the modern federal income tax and depreciation as a specified deduction have been with us continuously for over fifty years. Revenue Act of 1913, § II B and G(b). Nevertheless, the point is one strenuously in contest at the present time. The cases recently decided do not appear to be uniform. The Second Circuit, in opinions simultaneously filed by two separate panels on July 15, 1964, with a different judge vigorously dissenting in each case, has upheld the disallowance of the deduction. Fribourg Nav. Co. v. Commissioner, 335 F.2d 15 (2 Cir. 1964); United States v. Motorlease Corp., 334 F.2d 617 (2 Cir. 1964). To the same effect is Killebrew v. United States, 234 F.Supp. 481 (E.D.Tenn.1964). On the other hand, three district courts, in addition to Judge Devitt here, have approved deductibility and rendered decisions in favor of the taxpayer. Wyoming Builders, Inc. v. United States, 227 F.Supp. 534 (D.Wyo.1964), on appeal to the Tenth Circuit; Kimball Gas Products Co. v. United States, 63–2 USTC, par. 9507 (W.D.Tex.1962), on appeal to the Fifth Circuit; and Motorlease Corp. v. United States, 215 F.Supp. 356 (D.Conn. 1963), which the Second Circuit reversed by its split decision, 334 F.2d 617.

In addition, the Tax Court, on September 29, 1964, in a decision reviewed by the entire court (with one judge concurring separately and five judges dissenting), although reciting agreement with the results on the facts of Fribourg and Motorlease, has disagreed "with the rationale" of those decisions and has upheld depreciation in the year of sale. Macabe Co., 42 T.C. No. 87. And in still another case, decided October 20, 1964, and reviewed by the entire court (with three judges concurring separately and one judge dissenting), the Tax Court disallowed acquisition-year depreciation where the sale was negotiated during the acquisition year and closed at the very beginning of the succeeding year. Smith Leasing Co., 43 T.C. No. 5.

We are confronted, therefore, with varying approaches to the problem.

*The facts here.* These are established by the pleadings and stipulations. The taxpayer, S & A Company, uses the fiscal year ended August 31 and the accrual method of accounting. On April 1, 1956, the taxpayer sold all its outboard motor operating assets to McCulloch Corporation for cash, notes, and the assumption of liabilities. McCulloch acquired the assets it so purchased "for the purpose of continuing to carry on the business of manufacturing and selling outboard motors in the same manner as said business was carried on by" S & A and "has continued and expects to continue to carry on said business at the same location with substantially the same employees".

Taxpayer timely filed its return for its fiscal year 1956. It allocated the sale price among the several assets sold and elected to report its gain on the installment basis. In the return it claimed a

---

**2.** With the addition, by the Revenue Act of 1962, Pub.L. 87–834, § 13(a) (1), 76 Stat. 1032, of what is now § 1245 of the 1954 Code, applicable to taxable years beginning after 1962, the issue no longer exists for the type of property here involved. By this specific statute, capital gain treatment is not now available.

The statute, however, does not purport to affect directly the depreciation provisions of the Code. See, also, § 1250 of the 1954 Code, added by the Revenue Act of 1964, Pub.L. 88–272, § 231(a), 78 Stat. 100, and applicable to taxable years ending after 1963.

deduction for depreciation on the sale assets for the period from the beginning of the fiscal year to the date of the sale.* The amount of the claim was consistent with the straight-line depreciation which had been asserted by the taxpayer and which had been allowed by the Commissioner of Internal Revenue with respect to the taxpayer's returns for fiscal 1955 and prior fiscal years. The Commissioner, however, disallowed the deduction for fiscal 1956.

The government by its brief concedes, and the district court found: At all times from its acquisition of the depreciable assets and until their sale, the taxpayer intended to use those assets in its business for their entire economic life. The taxpayer also estimated their period of business usefulness to be the entire economic life. This expectation "at all times prior to the effectuation of the sale" was reasonable and consistent with prior experience. At no time before the sale did the taxpayer have any plan to sell or otherwise dispose of the depreciable assets before the end of their life. This life had not terminated at the time of the sale.

*Questions which are not before us.* It is well to note what is not in contest here: (1) No question is raised as to the taxpayer's allocation of the sale proceeds among the several assets sold; the propriety of this is accepted. (2) No question is raised as to the taxpayer's right to report its gain on the sale by the installment method; this is assured by § 453 of the 1954 Code. (3) No question is raised as to the taxpayer's use of the straight line method of depreciation; this is permitted by § 167(b)(1) of the Code.

And (4) no question is raised as to the amount of the depreciation claimed, that is, as to its reasonableness and propriety, if any depreciation is allowable at all.

The issue, therefore, we emphasize again, is simply whether the fact that this favorable sale took place during the tax year necessitates, in the light of all the other facts here, the disallowance of otherwise allowable depreciation.

*The statute and the regulations.* The 1954 Code, of course, controls. Section 167(a) states simply and flatly, "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business". The section goes on to provide that the "reasonable allowance" shall be computed under the straight line method, employed by the taxpayer here, or under one of other acceptable methods. Subsection (f) [3] provides that "The basis on which exhaustion, wear and tear * * * are to be allowed * * * shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property". This adjusted basis, by § 1012, with exceptions not significant here, "shall be the cost of such property". Thus, the statute establishes the depreciation standard of a "reasonable allowance" and it gears depreciation to cost. It does not define the terms "salvage value" or "useful life"; the latter does appear in the statute and both are used in the regulations.

The pertinent portions of the regulations under the 1954 Code are set forth in the margin.[4] It is readily apparent

3. Subsection (f) of § 167 has now become subsection (g). This redesignation was effected by the Revenue Act of 1962, § 13 (c) (1), Pub.L. 87–834, 76 Stat. 1034.

4. § 1.167(a)–1 Depreciation in general (a) Reasonable allowance. * * * The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property * * * An asset shall not be depreciated below a reasonable salvage value * * * The allowance shall not reflect amounts representing a mere reduction in market value. * * *

(b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period

that these, too, as is to be expected, tie depreciation to cost; that they take into account a salvage value at the end of the asset's useful life; that useful life is the reasonably expected period of the taxpayer's business use of the asset; that useful life and salvage value are both estimates and are made at acquisition; that they deny effects occasioned by market fluctuations; that they refer to the taxpayer's "policy" of asset disposal; that they speak in terms of tax years, including both the year the asset is placed in service and the year it is retired, and in terms of deductibility each year; that a depreciable asset's retirement may be effected by sale; that gain or loss may result on the sale; and that reasonableness is determined upon end-of-the-year conditions.

over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. * * * Salvage value is not a factor for the purpose of determining useful life. * * * The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. * * *

(c) Salvage. Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life under the rules of paragraph (b) of this section, salvage value may be redetermined based upon facts known at the time of such redetermination of useful life. * * * The time at which an asset is retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. However, if the taxpayer customarily uses an asset until its inherent useful life has been substantially exhausted, salvage value may represent no more than junk value. Salvage value must be taken into account in determining the depreciation deduction either by a reduction of the amount subject to depreciation or by a reduction in the rate of depreciation, but in no event shall an asset (or an account)

be depreciated below a reasonable salvage value. * * *

§ 1.167(a)–8 Retirements

(a) Gains and losses on retirements. For the purposes of this section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business or in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment. * * *

(1) Where an asset is retired by sale at arm's length, recognition of gain or loss will be subject to the provisions of sections 1002, 1231, and other applicable provisions of law. * * *

§ 1.167(a)–10 When depreciation deduction is allowable

(a) A taxpayer should deduct the proper depreciation allowance each year. * * *

(b) The period for depreciation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service. A proportionate part of one year's depreciation is allowable for that part of the first and last year during which the asset was in service. * * *

§ 1.167(b)–(o) Methods of computing depreciation

(a) In general. Regardless of the method used in computing depreciation, deductions for depreciation shall not exceed such amounts as may be necessary to recover the unrecovered cost or other basis less salvage during the remaining useful life of the property. The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made. It is the responsibility of the taxpayer to establish the reasonableness of the deduction for depreciation claimed. Generally, depreciation deductions so claimed will be changed only where there is a clear and convincing basis for a change. * * *

We particularly note that the Second Circuit majority in Motorlease, supra, p. 618 of 334 F.2d stated that "neither the Code nor the regulations are dispositive of the issue", and that the Fribourg and Motorlease dissenters took issue with that statement.

*Legislative history.* Until 1942 any gain on the sale of a depreciable business asset was taxed at ordinary rates. Consequently, the allowance or disallowance of depreciation in the sale year, with corresponding presence or absence of adjustment in basis, made no difference in ultimate tax. The 1942 Act extended capital gain treatment to gains realized upon the sale of certain depreciable non-inventory business assets.[5] Thereafter, on a number of occasions, Congress was advised of situations deemed to present undeserving capital gain advantages and of the possible need to treat certain gains in this business asset area as ordinary income. See Hearings Before the House Committee on Ways and Means, 80th Cong., 1st Sess., on Revenue Revisions 1947–48, Part 5, p. 3756; remarks of Senator Milliken in connection with H.R. 8920, 81st Cong., 2d Sess., 96 Cong. Rec. 14057 (1950); H.Rep.No.3124, 81st Cong., 2d Sess. 29 (1950); H.Rep.No. 586, 82d Cong., 1st Sess. 26 (1951); Hearings Before the Senate Committee on Finance, 83d Cong., 2d Sess., on H.R. 8300, Part 3, p. 1324; H.Rep.No.1337, 83d Cong., 2d Sess. A275 (1954); remarks of Representative Curtis at 100 Cong.Rec. 3678 (1954); remarks of the President in his budget message to Congress of January 18, 1960, Budget of the United States Government for the Fiscal Year Ending June 30, 1961, p. M–11; Treasury Department Release A–761, dated February 15, 1960; letter dated April 20, 1961, of the President to Congress, Hearings Before the House Committee on Ways and Means on the President's 1961 Tax Recommendations, vol. 1, p. 13; H.Rep.No.1447, 87th Cong., 2d Sess. 66–67 (1962); and S.Rep.No. 1881, 87th Cong., 2d Sess. 95 (1962). Congress, however, did not act on all these recommendations and, when it did, it changed only the classification from capital gain to ordinary income. It did not change the depreciation section. See, for example, Revenue Act of 1950, § 216(c), adding subsection (g) (3) to § 117 of the 1939 Code, now § 1238 of the 1954 Code; Revenue Act of 1951, § 328 (a), adding subsection (o) to § 117 of the 1939 Code, now § 1239 of the 1954 Code; Revenue Act of 1962, § 13(a) (1), adding § 1245 to the 1954 Code; and Revenue Act of 1964, § 231(a), adding § 1250 to the 1954 Code.

As to all this, the government says that the suggestions to Congress were directed at sale gains attributable to depreciation allowable in prior years and not to sale year depreciation.

*Supreme Court cases.* United States v. Ludey, 274 U.S. 295, 300–301, 47 S.Ct. 608, 610, 71 L.Ed. 1054 (1927), contains Mr. Justice Brandeis' characterization of depreciation[6] as the "reduction" of the

---

5. Revenue Act of 1942, § 151(b), which added subsection (j) to § 117 of the 1939 Code. This, with later amendments, came over to the 1954 Code as § 1231.

6. "The depreciation charge permitted as a deduction from the gross income in determining the taxable income of a business for any year represents the reduction, during the year, of the capital assets through wear and tear of the plant used. The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost. The theory underlying this allowance for depreciation is that by using up the plant a gradual sale is made of it. The depreciation charged is the measure of the cost of the part which has been sold. When the plant is disposed of after years of use, the thing then sold is not the whole thing originally acquired. The amount of the depreciation must be deducted from the original cost of the whole in order to determine the cost of that disposed of in the final sale of properties. Any other construction would permit a double deduction for the loss of the same capital assets."

asset by wear and tear throughout its useful life in the business; as constituting, in theory, "a gradual sale"; and as requiring a corresponding adjustment downward in original cost, despite the absence of a specific provision to that effect in the then controlling statute.[7] Massey Motors, Inc. v. United States, 364 U.S. 92, 93, 107, 80 S.Ct. 1411, 1413, 1419, 4 L.Ed.2d 1592 (1960), refines the Ludey approach with the rule that the reasonable allowance for depreciation of business property "is to be calculated over the estimated useful life of the asset while actually employed by the taxpayer, applying a depreciation base of the cost of the property to the taxpayer less its resale value at the estimated time of disposal", and that "the useful life of the asset be related to the period for which it may reasonably be expected to be employed in the taxpayer's business". Hertz Corp. v. United States, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603 (1960), accompanies Massey and upholds the provision of the regulations that "in no event shall an asset * * * be depreciated below a reasonable salvage value". One must mention, also, Detroit Edison Co. v. Commissioner, 319 U.S. 98, 101, 63 S.Ct. 902, 904, 87 L.Ed. 1286 (1943), with its concise statement of the purpose of the depreciation deduction,[8] repeated with approval in Massey, p. 104 of 364 U.S., p. 1418 of 80 S.Ct., and Virginian Hotel Corp. v. Helvering, 319 U.S. 523, 525–526, 63 S.Ct. 1260, 87 L.Ed. 1561 (1943), with its emphasis on the continuity of wear and tear and on the year as the unit of taxation.

We emphasize at this point that the automobiles with which Massey was con-cerned were not retained by those taxpayers for their economic life and had not been acquired with the intent so to retain them for that period. Thus their "salvage value was not junk value but the resale value at the time of disposal"[9] and "the experience of the taxpayers clearly indicates a utilization of the asset for a substantially shorter period than its full economic life". Pp. 95–97 of 364 U.S., pp. 1413–1414 of 80 S.Ct. It was in the context of these factual observations that the Court made its references, pp. 97 and 101, pp. 1414, 1416 and 1417 of 80 S.Ct. to salvage value, at the end of full economic life, as being "ordinarily nominal"; to the conversion of amounts "from income taxable at ordinary rates to that taxable at the substantially lower capital gains rates"; to the effect that "Congress intended by the depreciation allowance not to make taxpayers a profit thereby, but merely to protect them from a loss"; and that "Accuracy in accounting requires that correct tabulations, not artificial ones, be used".

*Other pertinent cases.* Cohn v. United States, 259 F.2d 371 (6 Cir. 1958), concerned depreciable assets owned by three flying schools, the programs of which had December 31, 1944, as the "target date" of reasonable maximum duration. Depreciation was computed accordingly but with no provision for salvage value. The assets of each school were sold at or about the end of useful life at prices in excess of adjusted cost at the beginning of the tax year. Depreciation for the year of sale was claimed but disallowed. The district court upheld the disallowance for the sale year and, as to one school,

---

7. The 1954 Code contains such a provision in its § 1016(a) (2). So have all predecessor Revenue Acts since that of 1924, with its § 202(b).

8. "The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue as to each classification of depreciable property an amount which at the time it is retired will with its salvage value replace the original investment therein."

9. It is to be noted, however, that in Commissioner v. Evans, the companion case to Massey, and covered by the same opinion, the salvage value as determined by the Commissioner was not identical with sale price but was, in fact, lower than sale price. Pp. 94–95 of 364 U.S., 80 S. Ct. 1411.

even for the year preceding sale. The Sixth Circuit approved what it regarded as "a reconsideration and redetermination of salvage value" and described the question before it in the following words, p. 378 of 259 F.2d:

"In so far as this case is concerned the issue is whether salvage value can be adjusted at or near the end of the useful life of the asset when it is shown by an actual sale of the asset that there is a substantial difference between what was estimated and what it actually is. We are not concerned with mere fluctuations or with any fluctuations from year to year. On the contrary, we have a single and final adjustment in the closing of the books on the asset involved."

Wier Long Leaf Lumber Co., 9 T.C. 990 (1947), reversed in part on another issue, 173 F.2d 549 (5 Cir. 1949), concerned depreciation on a sawmill and on three business automobiles. Here the useful life of the mill was dependent upon available standing timber. The mill was favorably sold, due to war conditions, at the time the timber was substantially exhausted. The automobiles were sold in the same year but before the end of their estimated useful life. The Tax Court, in a decision reviewed by the court, with five dissents, disallowed depreciation on the mill in the year of sale, but, with two dissents, allowed it on the automobiles. The court's theory of decision as to the mill is revealed when it refers to "the currently ascertained correct salvage value" and an "adjustment to correct for mistaken salvage value", p. 998 of 9 T.C. On the automobile issue the court observed, p. 999, that "mere appreciation in value due to extraneous causes has no influence on the depreciation allowance, one way or the other. * * * The sole fact * * * that a given price is received for articles not fully depreciated throws no light on the effect upon the depreciation allowance". The court thus drew a distinction between what it regarded, on the facts of that case, as a justifiable adjustment in sal-vage value on a sale at or near the end of economic life and the impropriety of such an adjustment merely because of the fact of sale in midlife. It may be of some interest and significance, so far as the Commissioner's attitude is concerned, that he acquiesced in Wier, 1948–1 C.B. 3, for fourteen years and then, after the present suit was instituted, withdrew that acquiescence, 1962–1 C.B. 5.

This same distinction, as to the timing of the sale, appears to have been made in Kimball Gas Products Co. v. United States, supra, 63–2 USTC, par. 9507 (W.D.Tex.1962), at p. 89127, now on appeal to the Fifth Circuit. Mr. Justice Harlan in his separate dissenting-concurring opinion in Massey observed, p. 113 of 364 U.S., p. 1427 of 80 S.Ct., 5 L.Ed.2d 78, that there "even the Commissioner does not contend that a taxpayer who *happens* to dispose of some asset before its physical exhaustion must depreciate it on a useful life equal to the time it was actually held". Although this statement appears in dissent, it is factual in nature and we see no reason why it is not to be accepted as true.

Wyoming Builders, Inc. v. United States, supra, 227 F.Supp. 534 (D.Wyo. 1964), now on appeal to the Tenth Circuit, and Motorlease Corp. v. United States, supra, 215 F.Supp. 356 (D.Conn.1963), reversed, as above noted, by the Second Circuit, 334 F.2d 617, are other cases where, with opposition by the government, trial courts have allowed depreciation in the year where the asset was sold at a price greater than adjusted basis at the beginning of the year.

Then came the Second Circuit's decisions in Fribourg and Motorlease, supra. Fribourg concerned a ship sold, after two years of its three year "concededly reasonable" estimated life, at a price made extraordinarily favorable because, as the Court described it, the estimate of economic life and salvage value, originally specifically approved by the Commissioner, "was thrown out of kilter by a scarcity of ships resulting from the Suez Crisis of 1956–57, which sharply inflated the values of ships normally considered obsolete".

Motorlease concerned vehicles sold or traded in by an automobile lessor, as a general practice, after one or two years. In Fribourg the majority observed that, "Though perhaps logically inconsistent", its conclusion was "strongly suggested" by Cohn, and that "the increment in [the ship's] value resulted from a fortuity normally associated with capital gain". Killebrew v. United States, supra, 234 F.Supp. 481 (E.D.Tenn.) is a district court decision approving disallowance.

Randolph D. Rouse, 39 T.C. 70, 76–77 (1962), did not draw the distinction which, as we have noted, was made in Cohn and Wier. The taxpayer there, because of changes in real estate conditions, sold certain houses he had held for rental. His sales prices were in excess of adjusted basis as of the year's beginning. The Tax Court judge, in an opinion not reviewed by the entire court, concluded, citing Cohn, "Accordingly, no depreciation deduction is allowable on account of a home thus sold for the taxable year during which it was sold". In rather dramatic contrast, however, he also concluded that the Commissioner erred in disallowing claimed depreciation on similar houses not sold. Two later single judge cases followed Rouse, Fribourg Nav. Co., 21 T.M.C. 1533 (1962), affirmed by the Second Circuit, supra, 335 F.2d 15, and Contra Costa Trucking Co., 22 T.C.M. 1018 (1963). See also, Edward V. Lane, 37 T.C. 188 (1961), which, however, concerned a taxpayer who employed the completed contract method and thus was not required to make the original estimates for annual depreciation deductions.

Rouse was followed by the September 29, 1964, decision of the Tax Court in Macabe Company, Inc., supra. This case concerned a downtown Portland, Oregon, office building reconstructed after acquisition by the taxpayer. It was "unexpectedly disposed of" in midlife, partly because of the cash requirements of the estate of a deceased shareholder of the taxpayer. It was stipulated that after reconstruction of the building the value of downtown rental properties in Portland "increased substantially". The Tax Court majority concluded that the Commissioner's position failed to take into account the distinction between true depreciation, that is, the gradual exhaustion of property, on the one hand, and, on the other, a rise or fall in value because of market conditions, and, further, that the Commissioner failed to comply with the underlying intent of the statute and the provisions of his own regulations. It noted the Second Circuit's opinions in Fribourg and Motorlease; chose not to disagree with the results in those two cases on the theory that at least a portion of the gains there seemed to have resulted from "inaccurate estimates" and that there was lack of proof as to the gain's being due to market appreciation; concluded, apparently, that the opposite was true in Macabe; and stated that, to the extent that Rouse, supra, was inconsistent, "we decline to follow it". Judge Withey concurred on the ground that Congress, in allowing a deduction for depreciation, did so with the intent that it was to be offset against ordinary income and not against a capital gain resulting from a sale or exchange of the asset. Smith Leasing Co., which we have noted above, came down three weeks later.

In addition, we note, for what it may be worth, that there is an imposing number of other older cases which reveal situations where depreciation has been computed and allowed during the year of a favorable sale. Among these are the Supreme Court cases of United States v. Ludey, supra, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054, reversing 61 Ct.Cl. 126, and Eldorado Coal & Mining Co. v. Mager, 255 U.S. 522, 526, 41 S.Ct. 390, 65 L.Ed. 757 (1921); our own case of Forrester Box Co. v. Commissioner, 123 F.2d 225 (8 Cir. 1941); apparently the Second and Third Circuit cases of Kittredge v. Commissioner, 88 F.2d 632 (2 Cir. 1937); Beckridge Corp. v. Commissioner, 129 F.2d 318 (2 Cir. 1942); and Rieck v. Heiner, 25 F.2d 453, 454 (3 Cir. 1928), cert. denied 277 U.S. 608, 48 S.Ct. 603, 72 L.Ed. 1013; the Court of Claims

case of Hall v. United States, 43 F.Supp. 130, 131, 95 Ct.Cl. 539 (1942), cert. denied 316 U.S. 664, 62 S.Ct. 944, 86 L. Ed. 1740; and a number of Board of Tax Appeals cases, Grosvenor Atterbury, 1 B. T. A. 169, 171 (1924); Even Realty Co., 1 B. T. A. 355, 356 (1925); W. W. Carter Co., 1 B. T. A. 849, 850 (1925); Star Sporting Goods Co., 1 B. T. A. 1266 (1925); Keighley Mfg. Co., 2 B. T. A. 10, 11 (1925); Marchetti Roma Cafe Co., 2 B. T. A. 529, 530 (1925); Walter Frank, 2 B. T. A. 905 (1925); Cotton Concentration Co., 4 B. T. A. 121, 123 (1926); Island Line Shipping Co., 4 B. T. A. 1055 (1926); Seton Falls Realty Co., 6 B. T. A. 883, 884 (1927); Parkersburg & Marietta Sand Co., 11 B. T. A. 87, 90 (1928); Louis Kalb, 15 B. T. A. 865 (1929); Max Eichenberg, 16 B. T. A. 1368, 1369 (1929); Franklin Lumber & Power Co., 18 B. T. A. 1207 (1930), affirmed on this issue but modified in another respect, 50 F.2d 1059 (4 Cir. 1931); Herbert Simons, 19 B. T. A. 711, 712 (1930); Clark Thread Co., 28 B. T. A. 1128, 1150–1151, (1933), affirmed 100 F. 2d 257 (3 Cir. 1938); and Thos. Goggan & Bro., 45 B. T. A. 218 (1941). See Duncan-Homer Realty Co., 6 B. T. A. 730 (1927).

*Rulings.* There is also a series of administrative pronouncements in which depreciation to the date of sale seems consistently to have been recognized. I.T. 1158, I–1 C.B. 173 (1922); I.T. 1494, I–2 C.B. 1920–21 (1922); A.R.R. 6930, III–1 C.B. 45 (1924); G.C.M. 1597, VI–1 C.B. 71 (1927); the publication of Rieck v. Heiner, supra, at VII–1 C.B. 200 (1928); the Commissioner's acquiescence, supra, 1948–1 C.B. 3, in Wier Long Leaf Lumber Co., on the automobile issue as well as on the mill issue; and the examples in Reg. § 1.1238–1 which remain in substantially the same form since the issuance of T.D. 5851, 1951–2 C.B. 63.

We recognize, of course that the Commissioner may change his interpretation of a statute to correct a mistake of law. Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 183–184, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); Stevens Bros. Foundation, Inc. v. Commissioner, 324 F.2d 633, 641 (8 Cir. 1963), cert. denied 376 U.S. 969, 84 S.Ct. 1135, 12 L.Ed.2d 84. And the Commissioner would detract from the significance, if any, of these cases and rulings by urging (a) that most of them appeared in the 1920's; (b) that none occurred later than 1942 when capital gain rates were made applicable to favorable dispositions of certain business assets; (c) that in every reported case since 1942 the Commissioner has opposed the deduction; (d) that in some of these the taking of depreciation to the date of sale was no more than a "mere recitation"; and (e) that the regulations' examples, while "unfortunate" and an "inadvertency", are not in the section on depreciation and are not intended as an illustration of proper depreciation allowances.

*Summary.* We thus have a situation where (a) the statutes and the regulations do not, in so many specific words, resolve the situation before us; (b) the successive revenue statutes have shown a disposition on the part of Congress not to tamper comprehensively with final year depreciation; (c) the Supreme Court's guidelines do not afford a definitive answer to our present question; (d) the Commissioner and the courts for some time, at least, accepted depreciation in the favorable-sale year; (e) the Tax Court in Wier in 1947 and the Sixth Circuit in Cohn in 1958 upheld a redetermination of salvage value when a favorable sale took place at or near the end of the originally intended and estimated useful life; (f) nevertheless, the Tax Court in Wier also approved final year depreciation on automobiles sold in midlife; (g) three district courts have approved and one has disapproved year-of-sale depreciation; (h) the Second Circuit, dividedly, has upheld disallowance of such depreciation; and (i) the Tax Court, by an 11 to 5 vote, has disagreed with the Second Circuit's reasoning, has overturned one of its recent single judge opinions, and has reaffirmed the Cohn-Wier distinction.

All this, we suspect, leaves us free to do our own groping in the dark.

The government's position, as we understand it, is as follows: (a) "[T]here could be no clearer and more compelling basis for a redetermination of useful life than the known fact that the asset has been withdrawn from the business and sold at a time earlier than estimated". Also, "Useful life is not a shifting concept. Either it is defined as the full economic life or as being terminated upon resale. It cannot be both". (b) It is unrealistic and absurd to say that an asset depreciates in the very year when the taxpayer by a sale actually recovers more than its adjusted basis at the beginning of that year. (c) It is even more unrealistic to allow an income tax depreciation deduction when the taxpayer, by the sale plus earlier allowed depreciation, has already recovered its cost. (d) Depreciation is the tax-free recovery of cost permitted to the taxpayer because of the use and consumption of assets producing the business income which is taxed. It is not to be misused so as to effect a conversion with consequent tax benefit, due to the interplay of statutes, of what is ordinary income into capital gain. (e) Here, with a favorable sale in excess of basis, there is no consumption of cost whatsoever during the sale year. Thus, there can be no depreciation. Instead, and in contrast, there is realized appreciation. (f) Salvage value is sale price. (g) In any event, a deduction for depreciation must be reasonable. (h) Reasonableness is to be determined "upon the basis of conditions known to exist at the end of the period for which the return is made". Reg. § 1.167(b)–(O) (a). Here the end of the taxpayer's fiscal year was August 31, 1956. By then the sale had been effected and closed and existing conditions revealed its favorable character and substantial gain for the taxpayer. (i) Any claim for depreciation asserted in the sale year when the sale price exceeds adjusted basis at the beginning of the year is unreasonable on its face. (j) The language of Reg. § 1.167 (a)–1(c), which speaks of salvage value as determined at the time of acquisition, which denies a change therein merely because of price level fluctuations, and which acknowledges the possibility of a redetermination of salvage value where there is a redetermination of useful life, "is obviously concerned only with the development of reasonable estimates during the difficult period *before* actual useful life and salvage value become known". The Commissioner has taken this position formally in a published ruling. Rev.Rule 62–92, 1962–1 C.B. 29.[10] (k) Salvage value may be redetermined without a redetermination of useful life. The language of Reg. § 1.167(a)–1(c) is not a contrary restriction. (l) A sale, under the circumstances of this case, automatically redetermines useful life. (m) Price received at an actual sale is not a mere change in price level. Instead, it conclusively effects a change in salvage value

10. "The provision in section 1.167(a)–1(c) of the regulations to the effect that salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels applies to assets still on hand. The provision does not preclude adjustment of salvage value where there is a clear and convincing basis therefor even though no adjustment of useful life is required. The purpose of the provision is to eliminate needless and endless controversies over depreciation allowances which at best are merely informed estimates of the cost of using the property in the taxpayer's business. That purpose has been served when the asset is disposed of and when a final transaction has occurred over which there can be no dispute or difference of opinion or judgment. * * * [I]t is not only reasonable but proper to take the ultimate facts into consideration in determining the depreciation deduction for the year of disposition of the asset. Therefore, the deduction for depreciation of an asset used in the trade or business or in the production of income shall be adjusted in the year of disposition so that the deduction, otherwise properly allowable for such year under the taxpayer's method of accounting for depreciation, is limited to the amount if any, by which the adjusted basis of the property at the beginning of such year exceeds the amount realized from sale or exchange."

and this directly affects the depreciation allowance.

There is, as the Tax Court said in Macabe, supra, "a beguiling appeal" in the government's contention. Judge Devitt seems to agree when he said, p. 679 of 218 F.Supp., "At first blush, it would appear that the taxpayer is attempting to ride with the hares and hold with the hounds, and thus to unjustly enrich itself * * *." And Mr. Justice Harlan, at p. 107 of 364 U.S., 80 S.Ct. 1424, prefaced his opinion of dissent and concurrence in Massey with a reference to "what may be thought to be an appealing practical position on the part of the Government".

It would seem, offhand, that the issue presented by the simple and undisputed facts of this case should be of no greater consequence than a straightforward routine income tax accounting matter obviously to be resolved by consistent treatment in each of the calendar years in which the assets are held, including the first and the last, and that this would justify the deduction of depreciation in the year of midlife sale. Yet this apparent simplicity of solution has not been forthcoming. Instead, we are confronted with the complicated and detailed mixture of statutes, legislative history, regulations, cases, and rulings which we have attempted to outline. This background and the length and vigor of the opposing arguments disclose that the question is taken to be close and difficult. We venture to say that much of the trouble, if the question is a difficult one, is attributable not to the governing statute, which is most general in its terms, but to the consistent failure of the regulations to be definite and specific upon this ever-recurring final year question.

After earnest consideration of all the arguments which have been advanced upon us by the contending parties, we reach the conclusion that, on the facts here presented—unanticipated and non-customary sale in midlife of a depreciable asset; acceptance of the correctness and reasonableness of the taxpayer's acquisition estimates of useful life and salvage value; actual approval of depreciation based on these estimates in prior years, some of which still remained open; and the inescapable inference that the claimed depreciation would have been allowed for the sale year had the sale not taken place—the taxpayer has sustained its burden of proof and is entitled to the deduction. We reach this conclusion because we feel that the following in the aggregate are persuasive:

1. The facts here possess impressive strength. The taxpayer's sale of its outboard motor assets was a sale of a going business. It acquired those assets and continued to hold them with, at all times, the intent to keep and utilize them in its business until the end of their economic life. It did not intend to dispose of them in the midst of that life and it had established no practice of early disposal, as was the situation in both Massey and Hertz. No challenge is made as to the correctness of the acquisition estimates of useful life and salvage value at the end of that life. The Commissioner accepted these estimates for all prior tax years and would have accepted them for fiscal 1956 had the sale not taken place in that year.

2. Cost or other basis, that is, the taxpayer's investment, not sale price, is depreciation's anchor. Both the statute, § 167(f) [§ 167(g), since the Revenue Act of 1962] and Reg. §§ 1.167(a)–1(a), 1.167(f)–1, and 1.167(b)–(O) (a) emphasize cost or other basis. Replacement of that investment by appropriate current charges against business income is the purpose of the depreciation deduction. Detroit Edison, supra, p. 101 of 319 U.S., p. 903 of 63 S.Ct. (footnote 8, supra); Ludey, supra, p. 301 of 274 U.S., p. 610 of 47 S.Ct. (footnote 6, supra); Massey, supra, p. 104 of 364 U.S., 80 S.Ct. 1411.

3. The emphasis is on the taxable year as a unit and depreciation is to be taken in each year of the depreciating asset's useful life. Reg. § 1.167(a)–10(a). "Congress has elected to make the year the unit of taxation. * * * Thus the amount 'allowable' must be taken each year. * * * Congress has provided

for deductions of annual amounts of depreciation which, along with salvage value, will replace the original investment of the property at the time of its retirement". Virginian Hotel Corp. v. Helvering, supra, pp. 526 and 528 of 319 U.S., pp. 1262 and 1263 of 63 S.Ct. "Finally, it is the primary purpose of depreciation accounting to further the integrity of periodic income statements * * *." Massey, supra, p. 104 of 364 U.S., p. 1418 of 80 S.Ct.; Hertz, supra, p. 126 of 364 U.S., 80 S.Ct. 1420. "[I]t is sound accounting practice annually to accrue * * *" Detroit Edison, supra, p. 101 of 319 U.S., p. 904 of 63 S.Ct.; Ludey, supra, p. 301 of 274 U.S., 47 S.Ct. 608.

4. This emphasis on the tax year as a unit extends to the year in which the depreciable asset is retired. A proportionate part of a year's depreciation is then allowable for that last year. Reg. § 1.167(a)-10(b). The asset continues to depreciate in the hands of the taxpayer right up to the date of sale. At that date it is older, more worn, and possessed of shorter economic life.

5. Straight line depreciation depends upon three factors, cost or other basis, useful life, and salvage value. Cost or basis is known. Useful life and salvage value are estimates and are seemingly independent of each other. Massey, so heavily relied upon by the government here, ends with the comment, p. 107 of 364 U.S., p. 1419 of 80 S.Ct.:

> "We therefore conclude that the Congress intended that the taxpayer should, under the allowance for depreciation, recover only the cost of the asset less the *estimated* salvage, resale or second-hand value. This requires that the useful life of the asset be related to the period for which it may *reasonably be expected* to be employed in the taxpayer's business. Likewise, salvage value must include *estimated* resale or second-hand value." [emphasis supplied]

This emphasizes cost, estimated useful life and estimated salvage. The Tax Court in Macabe recognized this when it

said, p. —— of 42 T.C., "The essential concept underlying the depreciation allowance as set forth in section 167 is prediction or estimation." See, also, Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 655, 51 S.Ct. 262, 75 L.Ed. 594 (1931).

6. With no dispute here as to either cost or useful life, the case hinges on salvage value. But this is to be determined, not at the time of the asset's retirement, but at the time of acquisition. Reg. § 1.167(a)-1. Salvage value under certain circumstances may be redetermined as, for example, when useful life is properly redetermined. But it is not to be redetermined "merely because of changes in price levels". Reg. § 1.167 (a)-1(c). The possibility of gain on retirement of a depreciable asset is contemplated. Sections 1002 and 1231 of the Code. Reg. § 1.167(a)-8(a) (1). Thus, there is nothing inherently or inferentially wrong, taxwise, in the existence of gain or loss upon the unanticipated disposition of a depreciable asset in midlife. The assumption underlying depreciation is that it approximates current consumption. It is basically and admittedly an estimate and rarely ties in precisely to sale price. It perhaps would do so frequently if the market were fixed, rigid and known. But the market fluctuates and is not rigid. This fluctuation does not make recognized depreciation methods and the estimates required in connection therewith any less valid.

7. There is no absolute identity of salvage value with sales price. The one is not necessarily equivalent to the other. Neither the statute nor the regulations equate them or make an exception out of the sale year. The emphasis, as has been noted, is, instead, on the estimate of salvage value, on such estimate at acquisition, on redetermination as the exception, on the distinct possibility of gain or loss on disposition, and on divorcement of salvage value from price level fluctuations.

8. Massey and Hertz are not authority to the contrary. They hold merely that useful life in the hands of a taxpayer who

has intended to dispose of the asset before the expiration of its entire economic life terminates at the time of his disposition and that depreciation is to be estimated and computed accordingly. This view is validated by the factual observation of Mr. Justice Harlan in his separate dissent-concurrence in Massey, p. 113 of 364 U.S., p. 1427 of 80 S.Ct.:

> "[E]ven the Commissioner does not contend that a taxpayer who *happens* to dispose of some asset before its physical exhaustion must depreciate it on a useful life equal to the time it was actually held. It is only when the asset 'may reasonably be expected' to be disposed of prior to the end of its physical life that the taxpayer must base depreciation on the shorter period."

9. Depreciation and capital gain or loss are separate concepts in the income tax law although, of course, the one necessarily affects the other. The former in theory rests on a base independent of market fluctuations. The latter is aimed at those fluctuations. This dichotomy is inherent in the statute. It is defeated and ignored if depreciation is inevitably to be tied to sale price. The two concepts are easily confused for we tend to use the word "depreciation" not only in the sense of consumption but, as well, in the sense of a downward market fluctuation.

10. On the facts before us those provisions of Reg. § 1.167(b)–(O) (a) which deny depreciation beyond cost less salvage value and which determine the reasonableness of a claim for depreciation upon "conditions known to exist at the end of the period" do not defeat this taxpayer's claim for depreciation. Of course, a favorable sale price might, in some instances, be a factor indicative of acquisition-estimate error. But this is not necessarily so and, it seems to us, is distinctly not so where, as in this case, there has been and still is no challenge as to cost and as to the useful life and salvage value acquisition estimates. The propriety of all three factors is accepted. The lack of

challenge to the taxpayer's claimed and parallel depreciation deductions in prior tax years which were still open for audit adjustment is a concession to their propriety.

The government pins its case, instead, on the happy fact that the sale price exceeded beginning-of-year basis and it says that depreciation for the final year must therefore be "unreasonable". The favorable sale, however, does not serve to deny the correctness of the taxpayer's cost or the propriety of its useful life estimate or the propriety of its salvage value estimate. It does show that the market at the time of sale turned out to be different than that estimated. The difference may be due entirely to a fluctuating market or to other causes such as general inflation, a buyer's market, or the availability of the asset for more productive alternate uses. 48 Minn.L.Rev. 628, 635 (1964).

The government gives some emphasis to the fact that the sale price exceeded not only adjusted basis at the beginning of the year, but, as well, the original acquisition cost. Presumably it does so in the thought that this demonstrates extreme unreasonableness of the claimed final year depreciation. But, with no challenge to the acquisition estimates, the fact's significance may well be the other way. That sale price exceeds acquisition cost may tend to show that there was no element at all of unreality in the original estimates, which were necessarily based on cost, and that the excess is obviously due, instead, to market change.

11. This is not a situation where the assets are sold at or near the very end of useful life in the taxpayer's hands. When such time identity is present and is accompanied by excess of sale price over estimated salvage value, there may be justification in a given case for the disallowance of final year depreciation. This disallowance would then have to be based on a proper redetermination as of that time of the originally estimated salvage value. This is something more than the

happenstance of a favorable sale price. It is this, as we read those opinions, which underlies the rationale of Cohn and Wier (the mill issue). Wier's decision on the automobile issue stands in glaring contrast. It does not follow from Cohn and Wier that a favorable sale at the end of useful life compels a depreciation disallowance in all cases.

12. We have here, instead, an unanticipated sale in midlife. This record contains nothing which discloses any change in the economic life of the assets. The sale itself did not change this.

13. There is a logical inconsistency in the government's attack on year-of-sale depreciation and its allowance of the depreciation in preceding years still open for adjustment when the sale facts became known to the government. In justifying this, the government is forced into the position of paying its respects to our formalized and structured annual income tax reporting system. This illogic was recognized by the Second Circuit in Fribourg and by the dissenters in both Fribourg and Motorlease and is illustrated by the apparently overruled Rouse, where the Tax Court disallowed depreciation on houses sold but allowed it in the same year on similar houses unsold. As has been said in 3 Rabkin and Johnson, Federal Income, Gift and Estate Taxation, § 43.14, p. 4397m, "The Service has unjustifiably extended the rationale of the Massey and Cohn cases into a blanket rule that depreciation is to be disallowed for the year of sale whenever the selling price exceeds the depreciated basis at the beginning of the year".

The same illogic would be illustrated, too, if a sale, largely negotiated during one tax year, is closed within the first week of the succeeding tax year. The taxpayer, when his return for the prior year is later prepared and filed, certainly knows the sale facts. Yet the Commissioner, seemingly, would allow depreciation for the year of negotiation but disallow it for the sale year. Compare Smith Leasing Co., supra, 43 T.C. No. 5 (1964). If "reasonableness" of depreciation is to be determined in the light of the sale price, the claimed deduction would seem just as unreasonable for the taxpayer in the negotiation year as in the sale year. To say, under these assumed facts, that the conditions were not known to exist at the end of the negotiation year lends support to the claim that the Commissioner's disallowance for the sale year is distinctly and solely related to the fact of the fortuitous sale.

14. The government's present position exceeds that taken by it in one case (Evans) covered by the Massey opinion, for there the Commissioner did not precisely identify sales price with salvage value. There the Commissioner was not trying to eliminate all interplay between § 167 and § 1231. Here he would take that extra footage.

15. The government's position seems to emphasize hindsight and to abandon the concept that depreciation rests on prospective estimates which, to be sure, must be reasonable. It would, to use Judge Blumenfeld's words in Motorlease, p. 363 of 215 F.Supp., "set up an automatic hindsight re-evaluation which becomes a self-executing redetermination of salvage value triggered by the sale of depreciable assets".

16. There is no suggestion of tax evasion or, even, of tax avoidance here and no element of double deduction. Depreciation in the year of sale, while beneficial to this taxpayer in reducing ordinary income, is detrimental to it in increasing gain.[11] Nothing escapes taxation. That there is a difference in the tax rate upon ordinary income and the tax

---

11. This was not the case in Fribourg, supra. There a complete liquidation was effected and, as, the Second Circuit noted, it: "came within the sanctuary of Section 337" of the 1954 Code. Thus, that corporate taxpayer incurred no tax liability on the capital gain. The same is apparently true of Macabe, supra.

rate upon capital gain is an incident of the tax scheme which Congress saw fit to adopt for the year in question. It is not an escape hatch and to characterize it in terms of deliberate transmutation of ordinary income into capital gain seems unfair.

17. There is at least some significance in the recognition, over a long period of time, in many cases, including one of our own, in rulings, and in the regulations' examples still outstanding today, of depreciation as a deduction in the year of favorable sale. It is true that the regulations' examples are not in the sections dealing with depreciation, and that until 1942 it made no difference in tax whether the amount of claimed depreciation did or did not serve to reduce ordinary income with consequent increase or no change in sale gain. Nevertheless, we suspect that this long-continued practice and recognition, administrative and decisional, is indicative of the Commissioner's attitude and demonstrates that he felt this was correct and proper income tax accounting and in line with accepted business principles. It was only when the difference in tax impact entered the law that his change in attitude came about. This would seem to be attributable, not to a reevaluation of what is proper tax accounting, but to the fact that the new point of view, if it could be upheld, would result in greater tax.

18. There is some significance, also, in Congress' persistent failure directly to attack final year depreciation by way of statutory amendment. It was content, instead, to recharacterize gain with which it was dealing as ordinary income. And the 1962 and 1964 additions of §§ 1245 and 1250 to the 1954 Code were made to operate only prospectively. They do not purport to restate preexisting law.

19. We have deep respect for the conclusions reached by the Second Circuit majorities in Fribourg and Motorlease. But we cannot escape the feeling that the results in those cases underestimate both the law's dichotomy of approach to de-

preciation and to capital gain and, as well, the fact distinction, so apparent in Wier and so inherent in Cohn, between an intended sale of depreciable assets at or near the end of useful life and an unanticipated sale in midlife. To us, and obviously to the substantial Tax Court majority in Macabe, these appear to be important and significant.

We mention, by way of caveat, that we do not, by our conclusion here, hold that salvage value may never be redetermined in the year of sale or, conversely, that in every case depreciation must be allowed in the sale year; that we do not decide the question whether redetermination of salvage value may be effected only when there is a redetermination of useful life, as the taxpayer insists is the case under Reg. § 1.167(a)–1(c), and as the district court held; and that we do not say that the facts in Fribourg and Motorlease, on the one hand, and those in Macabe, on the other, are so distinguishable that the results in all three cases are entirely consistent.

We conclude that this good-faith taxpayer's claimed deduction for depreciation on the sale assets in its fiscal 1956 return was a proper deduction under § 167 of the 1954 Code. The district court's judgment is therefore affirmed.

VAN OOSTERHOUT, Circuit Judge (dissenting).

Judge Blackmun has fairly stated the facts and has admirably assembled all the background material pertinent to the decision of this case. He has adequately set out the respective contentions of the litigants and the statutes, regulations and decisions bearing upon the issue confronting us.

I agree that the taxpayer's estimates of cost, useful life and salvage value were reasonable when made. I do not question the finding that the depreciation claim here asserted is based upon well-established and recognized accounting practices. The depreciation claimed and allowed prior to the sale year is entirely proper and is not here attacked.

The narrow issue before us is whether it is reasonable to allow a deduction for depreciation in the year in which the depreciating assets are sold when it conclusively appears during the taxable year that the sale price exceeds the adjusted basis at the beginning of the taxable year.

Section 167(a) authorizes a reasonable deduction for depreciation. I agree with Judge Blackmun's view that the statute and the regulations do not by specific words resolve our problem. As pointed out by the majority opinion, distinguished and able judges have reached opposite results. A decision by the Supreme Court on the issue would appear to be desirable to resolve this controversy.

I disagree with the court's conclusion that the depreciation claimed for the sale year is reasonable under all the circumstances here existing. "Reasonable" is a flexible word. The reasonableness of the depreciation allowance here claimed is to be determined upon the basis of conditions known to exist at the end of the taxable year for which the return is made. It is not reasonable to say that depreciation is allowable in the sale year when it conclusively appears during such year that the taxpayer has already recovered more than its adjusted basis at the beginning of the year. I do not believe that Congress in providing for reasonable depreciation contemplated that any further depreciation should be allowable in the situation here presented. The overall pattern of the income tax laws is entitled to consideration. The tax consequences of allowing the additional depreciation claimed cannot be ignored in applying a test of reasonableness.

I am in accord with the interpretation made of the depreciation statute and regulations by the separate panels of the Second Circuit in Fribourg Nav. Co. v. Commissioner, 2 Cir., 335 F.2d 15, and United States v. Motorlease Corp., 2 Cir., 334 F.2d 617.

I would reverse upon the basis of the majority opinions in such cases.