# FRIBOURG NAVIGATION CO., INC. *v.* COMMISSIONER OF INTERNAL REVENUE.

No. 23.   Argued November 10, 1965.—Decided March 7, 1966.

*James B. Lewis* argued the cause for petitioner. With him on the briefs were *Simon H. Rifkind* and *Ernest Rubenstein.*

*Jack S. Levin* argued the cause for respondent. With him on the brief were *Acting Solicitor General Spritzer, Acting Assistant Attorney General Roberts* and *Harry Baum.*

Briefs of *amici curiae,* urging reversal, were filed by *Ellis Lyons* and *Jess S. Raban* for the American Automotive Leasing Association, and by *Leland W. Scott* for S & A Co.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The question presented for determination is whether, as a matter of law, the sale of a depreciable asset for an amount in excess of its adjusted basis at the beginning of the year of sale bars deduction of depreciation for that year.

On December 21, 1955, the taxpayer, Fribourg Navigation Co., Inc., purchased the S. S. *Joseph Feuer,* a used Liberty ship, for $469,000. Prior to the acquisition, the taxpayer obtained a letter ruling from the Internal Revenue Service advising that the Service would accept straight-line depreciation of the ship over a useful economic life of three years, subject to change if warranted by subsequent experience. The letter ruling also advised that the Service would accept a salvage value on the *Feuer* of $5 per dead-weight ton, amounting to $54,000. Acting in accordance with the ruling the taxpayer computed allowable depreciation, and in its income tax returns for 1955 and 1956 claimed ratable depreciation deductions for the 10-day period from the date of purchase to the end of 1955 and for the full year 1956. The Internal Revenue Service audited the returns for each of these years and accepted the depreciation deductions claimed without adjustment. As a result of these depreciation deductions, the adjusted basis of the ship at the beginning of 1957 was $326,627.73.

In July of 1956, Egypt seized the Suez Canal. During the ensuing hostilities the canal became blocked by sunken vessels, thus forcing ships to take longer routes to ports otherwise reached by going through the canal. The resulting scarcity of available ships to carry cargoes caused sales prices of ships to rise sharply. In January and February of 1957, even the outmoded Liberty ships brought as much as $1,000,000 on the market. In June 1957, the taxpayer accepted an offer to sell the *Feuer* for $700,000. Delivery was accomplished on December 23, 1957, under modified contract terms which reduced the sale price to $695,500. Prior to the sale of the *Feuer,* the taxpayer adopted a plan of complete liquidation pursuant to the provisions of § 337 of the Internal Revenue Code of 1954, which it thereafter carried out within 12 months. Thus, no tax liability was incurred by the taxpayer on the capital gain from the sale of the ship. As

it developed, the taxpayer's timing was impeccable—by December 1957, the shipping shortage had abated and Liberty ships were being scrapped for amounts nearly identical to the $54,000 which the taxpayer and the Service had originally predicted for salvage value.

On its 1957 income tax return, for information purposes only, the taxpayer reported a capital gain of $504,239.51 on the disposition of the ship, measured by the selling price less the adjusted basis after taking a depreciation allowance of $135,367.24 for 357½ days of 1957. The taxpayer's deductions from gross income for 1957 included the depreciation taken on the *Feuer*. Although the Commissioner did not question the original ruling as to the useful life and salvage value of the *Feuer* and did not reconsider the allowance of depreciation for 1955 and 1956, he disallowed the entire depreciation deduction for 1957. His position was sustained by a single judge in the Tax Court and, with one dissent, by a panel of the Court of Appeals for the Second Circuit. 335 F. 2d 15. The taxpayer and the Commissioner agreed that the question is important, that it is currently being heavily litigated, and that there is a conflict between circuit courts of appeals on this issue. Therefore, we granted certiorari. 379 U. S. 998. We reverse.

## I.

The Commissioner takes the position here and in a Revenue Ruling first published the day before the trial of this case in the Tax Court [1] that the deduction for

---

[1] Rev. Rul. 62–92, 1962–1 Cum. Bull. 29 (originally T. I. R. 384, June 7, 1962). That Ruling provides in part:

". . . the deduction for depreciation of an asset used in the trade or business or in the production of income shall be adjusted in the year of disposition so that the deduction, otherwise properly allow-. able for such year under the taxpayer's method of accounting for depreciation, is limited to the amount, if any, by which the adjusted basis of the property at the beginning of such year exceeds the amount realized from sale or exchange."

depreciation in the year of sale of a depreciable asset is limited to the amount by which the adjusted basis of the asset at the beginning of the year exceeds the amount realized from the sale. The Commissioner argues that depreciation deductions are designed to give a taxpayer deductions equal to the "actual net cost" of the asset to the taxpayer, and since the sale price of the *Feuer* exceeded the adjusted basis as of the first of the year, the use of the ship during 1957 "cost" the taxpayer "nothing." By tying depreciation to sale price in this manner, the Commissioner has commingled two distinct and established concepts of tax accounting—depreciation of an asset through wear and tear or gradual expiration of useful life and fluctuations in the value of that asset through changes in price levels or market values.

Section 167 (a) of the Internal Revenue Code of 1954 provides, in language substantially unchanged in over 50 years of revenue statutes: "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business, or (2) of property held for the production of income." In *United States* v. *Ludey,* 274 U. S. 295, 300–301, the Court described depreciation as follows:

"The depreciation charge permitted as a deduction from the gross income in determining the taxable income of a business for any year represents the reduction, during the year, of the capital assets through wear and tear of the plant used. The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost."

See also *Detroit Edison Co.* v. *Commissioner,* 319 U. S. 98, 101. In so defining depreciation, tax law has long recognized the accounting concept that depreciation is a process of estimated allocation which does not take account of fluctuations in valuation through market appreciation.[2]

It is, of course, undisputed that the Commissioner may require redetermination of useful life or salvage value when it becomes apparent that either of these factors has been miscalculated. The fact of sale of an asset at an amount greater than its depreciated basis may be evidence of such a miscalculation. See *Macabe Co.,* 42 T. C. 1105, 1115 (1964). But the fact alone of sale above adjusted basis does not establish an error in allocation. That is certainly true when, as here, the profit on sale resulted from an unexpected and short-lived, but spectacular, change in the world market.

The Commissioner contends that our decisions in *Massey Motors, Inc.* v. *United States,* 364 U. S. 92, and *Hertz Corp.* v. *United States,* 364 U. S. 122, confirm his theory. To the extent these cases are relevant here at all, they support the taxpayer's position. In *Massey* and *Hertz* we held that when a taxpayer, at the time he acquires an asset, reasonably expects he will use it for less than its full physical or economic life, he must, for purposes of computing depreciation, employ a useful life based on the period of expected use. We recognized in those cases that depreciation is based on estimates as to useful life and salvage value. Since the original estimates here were admittedly reasonable and proved to be accurate, there is no ground for disallowance of depreciation.

---

[2] See, *e. g., Macabe Co.,* 42 T. C. 1105, 1109; *Wier Long Leaf Lumber Co.,* 9 T. C. 990, 999, rev'd on other grounds, 173 F. 2d 549; Note, 50 Va. L. Rev. 1431 (1964); Comment, 11 U. C. L. A. L. Rev. 593 (1964). See also Montgomery's Auditing 268 (8th ed. 1957).

## II.

This concept of depreciation is reflected in the Commissioner's own regulations. The reasonable allowance provided for in § 167 is explained in Treas. Reg. § 1.167 (a)–1 as "that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan . . . so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property . . . . The allowance shall not reflect amounts representing a mere reduction in market value." Treas. Reg. § 1.167 (a)–1 (c) defines salvage value as the amount, determined at the time of acquisition, which is estimated will be realizable upon sale or when it is no longer useful in the taxpayer's trade or business. That section continues: "Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life . . . salvage value may be redetermined based upon facts known at the time of such redetermination of useful life." Useful life may be redetermined "only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination." Treas. Reg. § 1.167 (a)–1 (b). This carefully constructed regulatory scheme provides no basis for disallowances of depreciation when no challenge has been made to the reasonableness or accuracy of the original estimates of useful life or salvage value. Further, from 1951 until after certiorari was granted in this case, the regulations dealing with amortization in excess of depreciation contained an example expressly indicating that depreciation could be

taken on a depreciable asset in the year of profitable sale of that asset.[3]

The Commissioner relies heavily on Treas. Reg. § 1.167 (b)–0 providing that the reasonableness of a claim for depreciation shall be determined "upon the basis of conditions known to exist at the end of the period for which the return is made." He contends that after the sale the taxpayer "knew" that the *Feuer* had "cost" him "nothing" in 1957. This again ignores the distinction between depreciation and gains through market appreciation. The court below admitted that the increase in the value of the ship resulted from circumstances "normally associated with capital gain." The intended interplay of § 167 and the capital gains provisions is clearly reflected in Treas. Reg. § 1.167 (a)–8 (a)(1), which provides:

> "Where an asset is retired by sale at arm's length, recognition of gain or loss will be subject to the provisions of sections 1002, 1231, and other applicable provisions of law."

## III.

The Commissioner's position represents a sudden and unwarranted volte-face from a consistent administrative and judicial practice followed prior to 1962. The taxpayer has cited a wealth of litigated cases [4] and several

---

[3] Treas. Reg. § 1.1238–1, Example (1), based on H. R. Rep. No. 3124, 81st Cong., 2d Sess., 29 (1950), amended to conform to the Commissioner's present position on June 1, 1965. 1965–1 Cum. Bull. 366.

[4] See, *e. g.*, *United States* v. *Ludey*, 274 U. S. 295 (1927); *Eldorado Coal & Mining Co.* v. *Mager*, 255 U. S. 522, 526 (1921); *Beckridge Corp.* v. *Commissioner*, 129 F. 2d 318 (C. A. 2d Cir. 1942); *Clark Thread Co.* v. *Commissioner*, 100 F. 2d 257 (C. A. 3d Cir. 1938), affirming 28 B. T. A. 1128, 1140 (1933); *Kittredge* v. *Commissioner*, 88 F. 2d 632 (C. A. 2d Cir. 1937); *Seymour Mfg. Co.* v. *Burnet*, 56 F. 2d 494, 495–496 (C. A. D. C. Cir. 1932); *Hall*

rulings[5] in which the Commissioner unhesitatingly allowed depreciation in the year of favorable sale. Against this array of authority, the Commissioner contends that he did not "focus" on the issue in most of these instances. This is hardly a persuasive response to the overwhelmingly consistent display of his position. One might well speculate that the Commissioner did not "focus" on the issue in many cases because he treated it as too well settled for consideration. Moreover, in several instances, the Commissioner did not merely consent to depreciation in the year of sale, but insisted over the taypayer's objection that it be taken.[6]

The Commissioner adds that in *Wier Long Leaf Lumber Co.,* 9 T. C. 990, rev'd on other grounds, 173 F. 2d 549, he did focus on the issue and there contended that no depreciation could be taken in the year of sale. However, in *Wier* the Tax Court allowed depreciation as to one class of assets and the Commissioner promptly acqui-

---

v. *United States,* 95 Ct. Cl. 539, 43 F. Supp. 130, 131–132, cert. denied, 316 U. S. 664 (1942); *Herbert Simons,* 19 B. T. A. 711, 712–713 (1930); *Max Eichenberg,* 16 B. T. A. 1368, 1370 (1929); *Louis Kalb,* 15 B. T. A. 865, 866 (1929); *Even Realty Co.,* 1 B. T. A. 355, 356 (1925); *H. L. Gatlin,* 19 CCH Tax Ct. Mem. 131, 132 (1960); *P. H. & J. M. Brown Co.,* 18 CCH Tax Ct. Mem. 708, 709–710 (1959).

[5] G. C. M. 1597, VI–1 Cum. Bull. 71 (1927); S. M. 2112, III–2 Cum. Bull. 22 (1924); A. R. R. 6930, III–1 Cum. Bull. 45 (1924); I. T. 1494, I–2 Cum. Bull. 19 (1922). See also I. T. 1158, I–1 Cum. Bull. 173 (1922).

[6] In *Herbert Simons, supra,* note 4, the taxpayers tried without success to forgo the depreciation deduction for the year of sale since the taxes payable on the resulting increase in ordinary income would have been less than the increased amount payable under the existing capital gain provision if depreciation were taken. In several other cases the Commissioner expressly required a year-of-sale depreciation deduction, thus increasing the gain on the sale. See, e. g., *Clark Thread Co.* v. *Commissioner, Kittredge* v. *Commissioner, Even Realty Co., supra,* note 4.

esced in the decision.[7] 1948–1 Cum. Bull. 3. This acquiescence was not withdrawn until 14 years later when the Commissioner adopted his present position. 1962–1 Cum. Bull. 5. Although we recognize that such an acquiescence does not in and of itself commit the Commissioner to this interpretation of the law, it is a significant addition to the already convincing array of authority showing the Commissioner's consistent prior position.

The Commissioner attempts further to explain away the authority aligned against him by stating that most of the cases and rulings prior to 1942 (when capital gain treatment was provided for sales above adjusted basis) are irrelevant since the gain on sale was taxed at the same ordinary income rate that would have been applied had depreciation been disallowed. This contention does not explain away the Commissioner's sudden decision that allowance of such depreciation involves a fundamental error in the basic concept of depreciation. Further, other than his lack of "focus," the Commissioner has had no explanation for those cases in which capital gain on sale *was* involved.[8] Even in those cases before

---

[7] The Commissioner's argument that the decision in *Wier* was ambiguous since the court there disallowed depreciation of another asset in the year of sale is without merit. The court carefully rested its decision disallowing depreciation of that asset on the fact that there was no evidence in the record which would permit it to ascertain reasonable salvage value. With respect to the other class of assets, the court stated:

"The parties have by their stipulation narrowed the scope of controversy. They present for consideration only the question whether the price received from the sale of the depreciated automobiles precludes any depreciation allowance." 9 T. C. 990, 999.

The court held: "The depreciation deduction can not be disallowed merely by reason of the price received for the article without consideration of other factors." *Ibid.*

[8] See *Hall* v. *United States, Herbert Simons, Max Eichenberg, H. L. Gatlin, P. H. & J. M. Brown Co., supra,* note 4; G. C. M. 1597, VI–1 Cum. Bull. 71 (1927). See also cases cited, note 6, *supra.*

this Court upon which the Commissioner relies for support of his theory, depreciation was willingly allowed in the year of sale. In *Massey Motors, Inc.* v. *United States, supra,* although contesting the useful life of the automobiles involved, the Commissioner allowed depreciation to an estimated value of $1,325 despite sales for an average of $1,380. 364 U. S., at 94–95. And in *Hertz Corp.* v. *United States, supra,* the Commissioner accepted claims of depreciation deductions up to the date of sale, objecting only to the taxpayer's attempt to obtain refunds by changing retroactively to the double declining balance method of depreciation.[9] The fact that there are presently several hundred cases in litigation over this issue where before there were none adds testimony to the inescapable conclusion that the Commissioner has broken with consistent prior practice in espousing the novel theory he now urges upon us.

The authority relied on in Revenue Ruling 62–92, *Cohn* v. *United States,* 259 F. 2d 371, does not support this departure from established practice. *Cohn* was simply a case in which the taxpayer had assigned no salvage value to the property involved, and the Court of Appeals found no clear error in the selection of the amount realized on disposition of the asset at the end of its scheduled useful life as a reasonable yardstick by which to measure salvage value.[10] As has been aptly

[9] See 165 F. Supp. 261, 265, 269, and Transcript of Record in *Hertz* in this Court, at 13–18.

[10] Note, for example, the Court's reliance on *Wier Long Leaf Lumber Co.,* discussed in note 7, *supra.* 259 F. 2d, at 378–379. Indeed, the opinion in *Cohn* clearly recognizes the established practice of depreciation which the Commissioner would have us overthrow. The Court there noted:

"Necessarily, salvage value is also an estimate made at the time when the asset is first subject to a depreciation allowance. . . . If the asset is sold at a price in excess of its depreciated value, such excess is taxable in the nature of a capital gain." *Id.,* at 377.

stated of *Cohn*, "It does not purport to set up an automatic hindsight re-evalution which becomes a self-executing redetermination of salvage value triggered by the sale of depreciable assets." *Motorlease Corp.* v. *United States*, 215 F. Supp. 356, 363, rev'd, 334 F. 2d 617, pet. for cert. filed. In his brief in *Cohn*, the Commissioner did not rest his case on anything resembling his position here, but relied principally on the fact that the taxpayer himself had sought an adjustment of useful life and that, under the regulations, "if there is a redetermination of useful life, the salvage value may be redetermined." Brief for the United States, pp. 24–26, in *Cohn* v. *United States*, 259 F. 2d 371, quoted in Merritt, Government briefs in Cohn refute IRS disallowance of year-of-sale depreciation, 20 J. Taxation 156, 158 (1964).

## IV.

Over the same extended period of years during which the foregoing administrative and judicial precedent was accumulating, Congress repeatedly re-enacted the depreciation provision without significant change. Thus, beyond the generally understood scope of the depreciation provision itself, the Commissioner's prior long-standing and consistent administrative practice must be deemed to have received congressional approval. See, *e. g.*, *Cammarano* v. *United States*, 358 U. S. 498, 510–511; *United States* v. *Leslie Salt Co.*, 350 U. S. 383, 396–397; *Helvering* v. *Winmill*, 305 U. S. 79, 83.

The legislative history in this area makes it abundantly clear that Congress was cognizant of the revenue possibilities in sales above depreciated cost. In 1942 Congress restored capital gain treatment to sales of depreciable assets.[11] The accompanying House Report stated that it would be "an undue hardship" on taxpayers who

---

[11] Int. Rev. Code, 1939, § 117 (j), 56 Stat. 846 (now Int. Rev. Code, 1954, § 1231).

were able to sell depreciable property at a gain over depreciated cost to treat such gain as ordinary income. H. R. Rep. No. 2333, 77th Cong., 2d Sess., 54 (1942). This, of course, is *pro tanto* the effect of disallowing depreciation in the year of sale above adjusted basis. It would be strange indeed, especially in light of the House Report, to conclude that Congress labored to create a tax provision which, in application to depreciable property, could by administrative fiat be made applicable only to sales of assets for amounts exceeding their basis at the beginning of the year of sale, and then only to the excess. In succeeding years Congress was repeatedly asked to enact legislation treating gains on sales of depreciated property as ordinary income; [12] it declined to do so until 1962.

In 1961, in his Tax Message to Congress, the President observed that existing law permitted taxpayers to depreciate assets below their market value and, upon sale, to treat the difference as capital gain.[13] The Secretary of

[12] See, *e. g.*, Hearings before the House Ways and Means Committee, 80th Cong., 1st Sess., on Revenue Revisions, pt. 5, p. 3756 (1948), at which the Treasury recommended that gains on sales of depreciable assets should be subject to ordinary income taxation to the extent the gains arose from accelerated depreciation; Hearings before the Senate Finance Committee, 83d Cong., 2d Sess., on H. R. 8300, pt. 3, p. 1324 (1954), at which Congress was asked by the American Institute of Accountants to enact that all gains on sales of depreciable assets be treated as ordinary income. See also Treasury Department Release A–761, February 15, 1960.

[13] The President stated:

"Another flaw which should be corrected at this time relates to the taxation of gains on the sale of depreciable business property. Such gains are now taxed at the preferential rate applicable to capital gains, even though they represent ordinary income.

"This situation arises because the statutory rate of depreciation may not coincide with the actual decline in the value of the asset. While the taxpayer holds the property, depreciation is taken as a deduction from ordinary income. Upon its resale, where the amount

the Treasury concurred in this position.[14]   The exhibits appended not only contain no mention of the Commissioner's power to require recalculation of depreciation in the year of sale, but refute the existence of such power. In example after example cited by the Treasury, the taxpayer had depreciated an asset, sold it for an amount in excess of its depreciated basis, and treated the difference as capital gain.[15]   The Treasury asserted that existing law permitted this practice, and made no mention of the power which the Commissioner now alleges he possesses to disallow year-of-sale depreciation.

In 1962 Congress enacted § 1245 of the Internal Revenue Code of 1954, providing that gain on future dispositions of depreciable personal property be treated as ordinary income to the extent of depreciation taken.   For post-1962 transactions § 1245 applies to the situation which occurred in the instant case and would produce greater revenue.   The taxpayer must report as ordinary income *all* depreciation recouped on sale, and this notwithstanding that the sale was part of a nonrecognition liquidation within § 337.   In 1964, a more complex re-

---

of depreciation allowable exceeds the decline in the actual value of the asset so that a gain occurs, this gain under present law is taxed at the preferential capital gains rate.   The advantages resulting from this practice have been increased by the liberalization of depreciation rates.

.           .           .           .           .

"I therefore recommend that capital gains treatment be withdrawn from gains on the disposition of depreciable property, both personal and real property, to the extent that depreciation has been deducted for such property by the seller in previous years, permitting only the excess of the sales price over the original cost to be treated as a capital gain."   Message on Taxation, Hearings before the Committee on Ways and Means, House of Representatives, H. R. Doc. No. 140, 87th Cong., 1st Sess., 11 (1961).

[14] *Id.*, at 40.

[15] *Id.*, at 262–267.   See also Treas. Reg. § 1.1238–1, note 3, *supra.*

capture provision dealing with real property was enacted. This time, however, Congress took into account the fact that increases in the value of real property are often attributable to a rise in the general price level and limited recapture of depreciation as ordinary income to a percentage of the excess over straight-line depreciation. H. R. Rep. No. 749, 88th Cong., 1st Sess., 101–102 (1963); S. Rep. No. 830, 88th Cong., 2d Sess., 132–133 (1964).[16] The Commissioner's position would ignore any such limitation. Compounding congressional activity in this area with repeated re-enactment of the depreciation provision in the face of the prior consistent administrative practice, we find the Commissioner's position untenable.

## V.

Finally, the Commissioner's position contains inconsistencies. He contends that depreciation must be disallowed in 1957 since the amount received on sale shows that the use of the asset "cost" the taxpayer "nothing" in that year. But under this view, since the asset was sold at an amount greater than its original purchase price, it "cost" the taxpayer "nothing" in 1955 and 1956 as well. The Commissioner's reliance on the structure of the annual income tax reporting system does not cure the illogic of his theory. Further, the Commissioner apparently will not extend his new theory to sit-

---

[16] In 1963, with the instant case already in the courts, Congress for the first time alluded to the position now taken by the Commissioner, noting that:

". . . it has been held that depreciation deductions should not be allowed to the extent they reduce the adjusted basis of the property below the actual amount realized. This provision, in providing for ordinary income treatment for certain additional depreciation, is not intended to affect this holding." H. R. Rep. No. 749, 88th Cong., 1st Sess., 103 (1963); S. Rep. No. 830, 88th Cong., 2d Sess., 133 (1964).

uations where it would benefit the taxpayer. If a depreciable asset is sold for *less* than its adjusted basis, it would seem to follow from the Commissioner's construction that the asset has "cost" the taxpayer an additional amount and that further depreciation should be permitted. However, Revenue Ruling 62–92 does not extend to such a case and the Commissioner has expressly refused to make it do so.[17]

The conclusion we have reached finds support among nearly all lower federal courts that have recently dealt with this issue.[18] Upon consideration *en banc,* the Tax Court itself has concluded that the Commissioner's position is without authorization in the statute or the regulations.[19]

---

[17] In *Engineers Limited Pipeline Co.,* 44 T. C. 226 (1965), the taxpayer contended that he should get a further depreciation deduction on assets which he sold for less than their depreciated basis. The Commissioner disallowed the additional deduction. See also *Whitaker* v. *Commissioner,* 259 F. 2d 379.

[18] See *United States* v. *S & A Co.,* 338 F. 2d 629 (C. A. 8th Cir.), affirming 218 F. Supp. 677 (D. C. D. Minn.), pet. for cert. filed; *Occidental Loan Co.* v. *United States,* 235 F. Supp. 519 (D. C. S. D. Calif.); *Wyoming Builders, Inc.* v. *United States,* 227 F. Supp. 534 (D. C. D. Wyo.); *Motorlease Corp.* v. *United States,* 215 F. Supp. 356 (D. C. D. Conn.), reversed on the authority of the decision below in the instant case, 334 F. 2d 617 (C. A. 2d Cir.), pet. for cert. filed; *Mountain States Mixed Feed Co.* v. *United States,* 245 F. Supp. 369 (D. C. D. Colo.). See also *Kimball Gas Products Co.* v. *United States,* CCH 63–2 U. S. Tax Cas. ¶ 9507 (D. C. W. D. Tex.). Contra, *Killebrew* v. *United States,* 234 F. Supp. 481 (D. C. E. D. Tenn.).

[19] *Macabe Co.,* 42 T. C. 1105 (1964). The attempt in *Macabe* to distinguish the instant case on the ground that here the taxpayer used inaccurate estimates and failed to sustain its burden of proof of market appreciation ignores the fact that the Commissioner does not contest the reasonableness of the original estimates of useful life and salvage value. See McNerney, Disallowance of Depreciation in the Year of Sale at a Gain, 20 Tax L. Rev. 615, 650 (1965).

In light of the foregoing, we conclude that the depreciation claimed by the taxpayer for 1957 was erroneously disallowed.

*Reversed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACK and MR. JUSTICE CLARK join, dissenting.

In my opinion, the Court of Appeals was faithful to the congressional concept of depreciation and to the Internal Revenue Code and applicable Treasury Regulations. Accordingly, I would affirm.

Section 167 (a) of the Internal Revenue Code of 1954 authorizes as a depreciation deduction only a *"reasonable* allowance" for exhaustion, wear and tear, and obsolescence. (Emphasis added.) This allowance was designed by Congress to enable the taxpayer to recover his net investment in wasting assets used in his trade or business or held for the production of income to the extent that the investment loses value through exhaustion, wear and tear, or obsolescence.[1] In this manner the tax-

---

[1] The House Report on the 1954 Internal Revenue Code has defined depreciation as "allowances [whereby] *capital invested in an asset* is recovered tax-free over the years it is used in a business." H. R. Rep. No. 1337, 83d Cong., 2d Sess., p. 22. (Emphasis added.) Similarly, in *Virginian Hotel Co.* v. *Helvering,* 319 U. S. 523, the Court discussed depreciation in terms of an amount "which, along with salvage value, will replace the original investment of the property . . . ." *Id.,* at 528. This Court has, on other occasions, spoken of depreciation in terms of a gradual sale of the depreciable asset as it is physically used up year by year in the trade or business. See *Massey Motors* v. *United States,* 364 U. S. 92, 104. However, this is to say the same thing in different words. Even if one views depreciation as representative of the physical exhaustion of an asset, it is not measured in terms of nuts and bolts but in terms of the "financial consequences to the taxpayer of the subtle effects of time and use on . . . his capital assets." *Detroit Edison Co.* v. *Commissioner,* 319 U. S. 98, 101. Investment is not to be measured in terms of original or initial cost, but in terms of "net investment," *Detroit*

payer will be taxed only on the net, rather than the gross, income produced by the depreciable asset in accordance with the general congressional scheme to tax only net income. It was not, however, the intent of Congress to enable the taxpayer to recover more than his actual net investment and thereby to convert ordinary income into a capital gain through excessive depreciation. "Congress intended by the depreciation allowance not to make taxpayers a profit thereby, but merely to protect them from a loss." *Massey Motors* v. *United States,* 364 U. S. 92, 101. See also *Detroit Edison* v. *Commissioner,* 319 U. S. 98, where the Court refused to allow the taxpayer to depreciate that portion of the initial investment of an asset that did not represent actual expenditure by it because borne by its customers. Accordingly, in judging whether a given depreciation deduction is "reasonable," we should determine whether the deduction is designed to recover tax-free only the actual investment in the asset, *Massey Motors, supra,* at 105, or whether it is calculated instead to return a greater amount.

It would be easy enough to compute depreciation if the taxpayer were required to wait until disposition of the asset, at which time he would know with precision his net investment, before he could claim a depreciation allowance. Whether he were then required to take the entire depreciation allowance in the year of sale or per-

---

*Edison Co.* v. *Commissioner, supra,* at 103, or "actual cost," *Massey Motors* v. *United States, supra,* at 106. Accordingly, salvage value, Treas. Reg. § 1.167 (a)–1, and other reimbursements received by the taxpayer, *Detroit Edison Co.* v. *Commissioner, supra,* must be deducted from the taxpayer's initial investment in the asset in order to arrive at a depreciable "net investment." I use the word "investment" rather than "cost" because "cost" may have so many different meanings, both to the accountant and to the tax lawyer, and some of those meanings would do considerable violence to the congressional purpose for depreciation allowances.

mitted to reopen the previous tax years during which he held the asset and spread the allowance ratably among them, it could be ensured that he would then recover precisely, but no more than, his actual, net investment. However, both for administrative and economic reasons, Congress has chosen to allow the taxpayer to take depreciation deductions in advance of the disposition of the asset by estimating what portion of his net investment should be allocated for the use of the asset in any given year. This estimate involves two unknowns: the duration of its use by the taxpayer [2] and the salvage value (resale price of the asset if it is resold).[3] Every effort must be made, in estimating these two values, to come as close to the actual figures as possible. *Massey Motors* v. *United States, supra.* Indeed, it is reasonable to use estimates at all only because the actual figures are generally not knowable in advance. However, when the actual figures do become known and they differ materially from the estimates of them previously made and they can be substituted for the estimates with almost no inconvenience or unfairness, then it seems to me to be clearly unreasonable, and hence unauthorized by § 167,

---

[2] Useful life is to reflect the realities of the taxpayer's actual experience rather than a possibly unrealistic conceptualized idea of inherent physical life. *Massey Motors* v. *United States, supra*, n. 1.

[3] As is the case with useful life, salvage value should reflect the actualities of the situation. When a depreciated asset is sold the economic reality is that the resale price is the salvage value. This practical definition of salvage value was clearly contemplated in *Massey Motors, supra*, n. 1, where the Court talked in terms of "real salvage *price*" and *"resale"* value. *Id.,* at 105, 107. (Emphasis added.) In *Hertz Corp.* v. *United States,* 364 U. S. 122, 127, the Court spoke in terms of "the price that will be received when the asset is retired." See also Treas. Reg. § 1.167 (a)–1 (c), which speaks in terms of an amount "realizable upon sale . . . of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income . . . ."

to continue to rely on the estimates. See *Hertz Corp.* v. *United States,* 364 U. S. 122, 128.

In the present case, Fribourg knew in 1957 what its actual net investment in the S. S. *Joseph Feuer* would be. It knew that if it claimed the previously estimated depreciation deduction for that year it would recover more than its net investment and would be immunizing other income from normal income tax rates.[4] It also knew that a readjustment could be made for 1957 with finality and without significant inconvenience because the resale value and useful life had been definitely determined. Nevertheless, Fribourg continued to use the previously estimated figures, known to it to be erroneous. This, to me, was patently unreasonable and, therefore, outside the scope of § 167.

Not only did Fribourg violate the terms of the statute, it also failed to comply with the applicable, long-standing Treasury Regulations. Treasury Regulation § 1.167(a)–1 (b) provides that the estimate of useful life is to be redetermined by reason of conditions known to exist at the end of the taxable year whenever the change in useful life is significant and there is a clear and convincing basis for the redetermination. As a companion provision, Treas. Reg. § 1.167 (a)–1 (c) provides that whenever there is a redetermination of useful life, salvage value should also be redetermined if required by facts known

---

[4] It is in this economic sense that the Commissioner means that it "cost" Fribourg nothing to use the S. S. *Joseph Feuer* in 1957. Obviously the ship suffered some physical wear and tear during use in 1957. But measured in economic terms Fribourg had already been compensated in advance for that wear and tear as it affected its net investment in the ship because excessive depreciation deductions had been taken in the earlier years. The Commissioner is asking now only that Fribourg be prevented from deliberately compounding the error innocently made in earlier years by continuing to claim depreciation deductions after it knew its entire net investment in the S. S. *Joseph Feuer* had already been recovered.

at the time of the redetermination. At the end of the taxable year 1957, Fribourg knew it had overestimated useful life by approximately one-third, which seems to me to be a significant error. At the same time, it knew its estimate of salvage value was only about one-thirteenth the actual salvage value. And, it had the clearest and most convincing basis possible for redetermination—it knew the actual figures. As I read the above regulations, they surely require a redetermination in this situation.

Further, Treas. Reg. § 1.167 (b)–0 says that "deductions for depreciation shall not exceed such amounts as may be necessary to recover the unrecovered cost or other basis less salvage . . . ." To the same effect are Treas. Reg. §§ 1.167 (a)–1 (a) and (c), which warn that "an asset shall not be depreciated below a reasonable salvage value," remembering that reasonableness is to be determined "upon the basis of conditions known to exist at the *end of the period for which the return is made.*" Treas. Reg. § 1.167 (b)–0. (Emphasis added.) See *Hertz Corp.* v. *United States, supra.* Yet here Fribourg knowingly recovered more than its "cost or other basis" less salvage. Here Fribourg knowingly depreciated its asset below a reasonable salvage value in light of conditions known at the end of 1957.

I think the majority misreads that provision in the regulations that says "Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset . . . . Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels." Treas. Reg. § 1.167 (a)–1 (c). That provision merely recognizes the fact that in years prior to the concluding of a resale agreement the salvage value can only be estimated and it would be administratively burdensome and frequently futile to require redeterminations each year

merely because of price changes that may ultimately prove ephemeral. But those provisions certainly do not express a policy against redetermination, in the year of a premature sale, of salvage value when it can be known with finality what effect the price levels will have on the salvage value. Rev. Rul. 62–92, 1962–1 Cum. Bull. 29; *Cohn* v. *United States,* 259 F. 2d 371, 378. The very next sentence in that regulation seems to acknowledge the relevance of price levels, provided that such recognition does not cause undue administrative hardship: "However, if there is a redetermination of useful life . . . , salvage value may be redetermined based upon facts known at the time of such redetermination of useful life."

The majority opinion faults the Commissioner for having "commingled two distinct . . . concepts of tax accounting—depreciation of an asset through wear and tear or gradual expiration of useful life and fluctuations in the value of that asset through changes in price levels or market values." In my opinion these two concepts, as used in the Internal Revenue Code, are necessarily commingled and it is unrealistic to expect that one can be isolated from the other. One of the essential elements in the concept of depreciation deductions is salvage value, Treas. Reg. § 1.167 (a)–1 (a); salvage value is resale price if the asset is resold, *Massey Motors* v. *United States, supra,* at 105–107; *Edward V. Lane,* 37 T. C. 188; and resale price is directly influenced by fluctuations in market value. To the extent that such fluctuations are predictable, they must be considered in making a reasonable estimate of salvage or resale value of the investment. See *Bolta Co.,* 4 CCH Tax Ct. Mem. 1067.[5] In addition,

---

[5] The Tax Court's current position on the relevance of predictable market appreciation at the time of a determination of useful life and salvage value is not entirely clear. Compare *Smith Leasing Co.,* 43 T. C. 37, with *Macabe Co.,* 42 T. C. 1105.

as reflected by this case, predictable market fluctuations in value may also affect the useful life of the asset. To the extent that disposal of an asset by sale becomes more attractive through market appreciation it can be expected that useful life, as defined in *Massey Motors, supra,* will shorten. Although market appreciation in this case was more rapid than will normally be the case, it was predictable for more than a year before Fribourg sold its ship, and by the end of 1957 Fribourg knew exactly what effect market appreciation would have upon the resale value of useful life. In this situation market appreciation should not have been disregarded.

The majority also contends that the Commissioner's position contains an inconsistency because he disallowed depreciation only for the year in which the sale occurred and did not require a disallowance for previous years although the resale price was sufficiently high to indicate that the S. S. *Joseph Feuer* did not "cost" Fribourg anything in the earlier years either. However, in the earlier tax years it was reasonable to rely on the estimated salvage value, since the actual salvage value was not then known. At any rate, it is well established that a modification of the depreciation allowance (for whatever reason) will not be applied retroactively to previous tax years. For example, if the useful life is determined to be longer than originally believed, the allowable depreciation is not modified for the prior years in which excessive depreciation had been taken, but the remaining undepreciated basis minus salvage value is spread ratably over the new estimated remaining useful life and depreciation deductions taken accordingly for the current and succeeding years. *Commissioner* v. *Cleveland Adolph Mayer Realty Corp.,* 160 F. 2d 1012; *Commissioner* v. *Mutual Fertilizer Co.,* 159 F. 2d 470; 4 Mertens, Law of Federal Income Taxation, § 23.47; see also *Virginian Hotel Co.* v. *Helvering,* 319 U. S. 523; S. Rep. No. 665, 72d Cong., 1st Sess., 29.

There is a further alleged inconsistency because the Commissioner may be refusing to allow additional depreciation in the year of sale when salvage value turns out to be less than the adjusted basis at the time of sale. This alleged inconsistency, however, should be dealt with when it is properly presented to us.[6]

Finally, I turn to the majority's contention that the Commissioner's position represents a dramatic departure from previous administrative and judicial practice and that congressional re-enactment of the depreciation provision during this time reflects congressional approval of that previous interpretation.

Several of the cases and revenue rulings relied upon by the majority to establish past practice were concerned with tax years previous to 1922,[7] when the first capital gain provision became applicable.[8] I would not give precedential significance to positions taken during that time because the tax saving resulting from a depreciation deduction in the year of sale would have been exactly offset by the tax liability resulting from the correspondingly greater gain upon the sale of the asset due to the lower

---

[6] Similarly, because our situation involves appreciated market values, we are not now concerned with that sentence in Treas. Reg. § 1.167 (a)–1 (a) that reads, "The allowance shall not reflect amounts representing a mere reduction in market value." At any rate, this sentence merely reflects the congressional intent that a taxpayer be permitted to recover his net investment in an asset to the extent that the net investment represents "exhaustion, wear and tear, [or] obsolescence."

[7] Of the rulings cited in n. 5 of the majority opinion, only one, G. C. M. 1597, VI–1 Cum. Bull. 71 (1927), involved a tax year after 1921. Both Supreme Court cases cited in n. 4 of the majority opinion, United States v. Ludey, 274 U. S. 295, and Eldorado Coal & Mining Co. v. Mager, 255 U. S. 522, were concerned with tax years prior to 1922. Similarly, Louis Kalb, 15 B. T. A. 865, and Even Realty Co., 1 B. T. A. 355, involved tax years prior to 1922.

[8] 42 Stat. 232, § 206 (a).

basis. The remaining revenue ruling [9] and most of the remaining cases relied upon by the majority were concerned primarily with issues other than the one now before us.[10] In the absence of any indication that the Commissioner or the courts in those instances focused on the precise issue now before us these examples are without precedential value. There is one early decision of the Board of Tax Appeals, *Herbert Simons,* 19 B. T. A. 711, and one by the Tax Court, *Wier Long Leaf Lumber Co.,* 9 T. C. 990, that did expressly consider the problem whether a taxpayer could claim depreciation in the year he sells an asset at a price above his depreciated basis for that asset. In *Wier Long Leaf Lumber Co.* the Commissioner challenged the right of the taxpayer to take depreciation in the year of sale and at least part of that court's opinion seems to support the Commissioner's position.[11] This leaves only *Herbert Simons* in which the Commissioner and the Board appear to take a considered position inconsistent with that now urged by the Commissioner. In my opinion that decision should be disapproved as being inconsistent with the statutory provision for depreciation and the interpretative regulations. In recent years, it should be

---

[9] G. C. M. 1597, VI–1 Cum. Bull. 71 (1927). See also Treas. Reg. § 1.1238–1, Example (1), which was designed to show the interaction between §§ 168 and 1238, not the allowance of depreciation of § 167. That example has now been retroactively amended to the date of its original adoption in 1951. T. D. 6825, 1965–1 Cum. Bull. 366.

[10] *Beckridge Corp.* v. *Commissioner,* 129 F. 2d 318; *Clark Thread Co.* v. *Commissioner,* 100 F. 2d 257; *Kittredge* v. *Commissioner,* 88 F. 2d 632; *Seymour Mfg. Co.* v. *Burnet,* 61 App. D. C. 22, 56 F. 2d 494; *Hall* v. *United States,* 95 Ct. Cl. 539, 43 F. Supp. 130; *Max Eichenberg,* 16 B. T. A. 1368; *H. L. Gatlin,* 19 CCH Tax Ct. Mem. 131; *P. H. & J. M. Brown Co.,* 18 CCH Tax Ct. Mem. 708.

[11] See also *Duncan-Homer Realty Co.,* 6 B. T. A. 730 (1927), where the Board of Tax Appeals sustained the Commissioner's refusal to allow depreciation in the year of a profitable sale.

observed, there is substantial judicial authority for the disallowance of depreciation in the year of a sale above depreciated basis.[12]

To the extent that the Commissioner took an inconsistent position in any of these early cases, I would certainly not now hold him to that position.[13] We have frequently in the past recognized the Commissioner's authority to re-evaluate a prior position upon the basis of greater experience and reflection and to adjust that position to the extent that he becomes convinced that an adjustment is necessary to comport with congressional intent, even when this results in a distinct reversal of a previous position and the taxpayer had relied upon the previous position.[14] *Dixon* v. *United States*, 381 U. S. 68; *Automobile Club of Michigan* v. *Commissioner*, 353 U. S. 180. Were the Commissioner denied this authority, it would be tantamount to freezing in acknowledged error. It seems strange, therefore, that the majority today would deny the Commissioner this authority when

[12] *Fribourg Navigation Co., Inc.* v. *Commissioner*, 335 F. 2d 15; *United States* v. *Motorlease Corp.*, 334 F. 2d 617, pet. for cert. filed; *Cohn* v. *United States*, 259 F. 2d 371; *Killebrew* v. *United States*, 234 F. Supp. 481.

[13] The Commissioner's acquiescence in *Wier Long Leaf Lumber Co.*, 9 T. C. 990, can have no clearer significance than has the opinion itself, with its arguably inconsistent holdings. At any rate, at the front of each cumulative bulletin it is clearly explained that acquiescences "have none of the force or effect of Treasury Decisions and do not commit the Department to any interpretation of the law." See *Dixon* v. *United States*, 381 U. S. 68.

[14] See 26 U. S. C. § 7805 (1964 ed.), which gives authority to the Secretary of the Treasury or his delegate to "prescribe all needful rules and regulations . . . , including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." Subsection (b) of that section says "The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."

his earlier position was not clear and when Fribourg has made absolutely no showing that it would not have made arrangements to sell the S. S. *Joseph Feuer* when it did but for a reliance upon the alleged previously inconsistent position of the Commissioner.

Under these circumstances, it also seems unrealistic to me to argue that, by re-enacting the depreciation provision on several occasions prior to the promulgation of Rev. Rul. 62–92 in 1962, Congress intended to give force of statutory law to the position that depreciation should be allowed on an asset in the year it is sold at a price above its depreciated basis. This reasoning has been recognized as "no more than an aid in statutory construction," *Helvering* v. *Reynolds,* 313 U. S. 428, 432, and as "an unreliable indicium at best" by THE CHIEF JUSTICE writing for the Court in *Commissioner* v. *Glenshaw Glass Co.,* 348 U. S. 426, 431. It is a particularly unreliable aid in statutory construction unless the previous interpretation had been clearly and officially promulgated and Congress had been specifically advised of that interpretation in connection with the re-enactment of the relevant statutory provision. *Higgins* v. *Commissioner,* 312 U. S. 212; see generally, 1 Davis, Administrative Law § 5.07. Here there was no official Treasury Regulation or Treasury Decision clearly articulating the theory that depreciation should be allowed in the year of profitable sale. Indeed, as indicated earlier, the relevant Treasury Regulations seemed generally to indicate quite the opposite conclusion. Nor is there any indication that anyone asserted to Congress during a time that it was considering re-enactment of the depreciation provision that the Commissioner had embraced a position that depreciation had to be allowed on property in the year that it was sold at a price in excess of its adjusted basis. The legislative history and various requests made to Congress upon which the majority

relies were directed to the capital gain provisions of the Code, not the depreciation provision. And, there are indications that Congress intended to treat the two provisions separately. See H. R. Rep. No. 749, 88th Cong., 1st Sess., 103 (1963); S. Rep. No. 830, 88th Cong., 2d Sess., 133 (1964). For example, the "undue hardship" which prompted Congress to enact § 1231 was no doubt the hardship of paying tax on gain resulting from many years of appreciation when all of the gain is bunched into the year of sale. The Commissioner's refusal to allow depreciation in the year of profitable sale is in no way inconsistent with this attempt by Congress to alleviate hardships resulting from the bunching of income. Further, the fact that Congress was asked in the President's 1961 Tax Message to enact legislation treating gain upon the sale of depreciated property as regular income to the extent that the property had previously been depreciated should not be construed as a representation to Congress that the Commissioner did not have the authority he now claims. That recommendation was generally concerned with excessive depreciation in years "previous" to the year of sale, an abuse that the Commissioner has never claimed to be able to correct without congressional assistance. None of the examples cited to Congress in this Message are inconsistent with the Commissioner's authority to deny depreciation in the year of profitable sale.[15]

In 1962 and again in 1964 Congress enacted certain recapture provisions.[16] These provisions indicate a congressional attitude, consistent with the Commissioner's position, that depreciation should not exceed actual, net investment and that excessive depreciation should not be

---

[15] Similarly, the other requests addressed to Congress mentioned in the majority opinion were concerned with problems beyond the remedial power of the Commissioner to disallow depreciation in the year of profitable sale.

[16] 26 U. S. C. §§ 1245, 1250 (1964 ed.).

permitted to convert ordinary income into capital gain. The only concrete evidence that Congress was really aware of the Commissioner's position that depreciation should be disallowed in the year of profitable sale is to be found in the House and Senate Reports considering § 1250, the recapture provision dealing with depreciable real estate. I think the comments contained in those Reports on the position taken by the Commissioner are highly relevant:

"[T]he enactment of this provision is not intended to affect the question of whether all or any part of a claimed deduction for depreciation is in fact allowable. For example, since in the year real property is sold the actual value of the property is known, it has been held that depreciation deductions should not be allowed to the extent they reduce the adjusted basis of the property below the actual amount realized. This provision, in providing for ordinary income treatment for certain additional depreciation, *is not intended to affect this holding*." H. R. Rep. No. 749, 88th Cong., 1st Sess., p. 103 (1963); S. Rep. No. 830, 88th Cong., 2d Sess., p. 133 (1964). (Emphasis added.)

Congress gave to the Secretary of the Treasury or his delegate, not to this Court, the primary responsibility of determining what constitutes a "reasonable" allowance for depreciation. When the Commissioner adopts a rational position that is consistent with the purpose behind the depreciation deduction, congressional intent, and the language of the statute and interpretative Treasury Regulations, I would affirm that position.